Carlos S. SOTO and Robert Mallory, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Elmer O. CADY, Thomas R. Israel and Gerald Heeringa, Defendants.

Carlos S. SOTO, Plaintiff,

v.

Elmer O. CADY, Administrator, Division of Corrections of the State of Wisconsin, et al., Defendants.

Civ. A. Nos. 80–C–146, 80–C–321.

United States District Court, E.D. Wisconsin.

June 29, 1983.

---

Peter J. Stone and Peter L. Gardon, Whyte & Hirschboeck, S.C., Milwaukee, Wis., for plaintiffs.

John R. Sweeney, Asst. Atty. Gen., Madison, Wis., for defendants.

## DECISION

TERENCE T. EVANS, District Judge.

Case number 80–C–146 is a class action suit brought on behalf of inmates confined in the Adjustment Center at the Wisconsin Correctional Institution at Waupun, Wisconsin. The inmates seek an injunction, or alternatively declaratory relief, prohibiting the current uses of chemical agents ("mace" hereinafter) at the prison.

Case number 80–C–321 is an individual macing suit brought by Carlos S. Soto, a former inmate at Waupun. Soto's individual claim for damages was consolidated and tried with the class action claims in 80–C–146.

Trial to the court was held in November, 1982. The first day of the trial took place at the prison. During the first day, I heard testimony from inmates and visited the Adjustment Center. The balance of the trial took place in Milwaukee. The following discussion precedes my formal findings of fact and conclusions of law.

I have been to the prison at Waupun on many occasions. I have also had a number of opportunities to visit the prison's Adjustment Center. While the prison, and particularly the Adjustment Center, has never been what one would call a pleasant place, I have never seen it as dangerously overcrowded as it was when I was there during this trial. The prison is, of course, holding

over 300 inmates beyond its approved capacity. Inmates in the Adjustment Center are dangerously doubled up in cells that are small even for one person. In short, the situation is an accident waiting to happen. I believe that the severe overcrowding at the prison, especially in the Adjustment Center, has contributed significantly to the tensions that precipitated many of the incidents about which I have heard testimony or reviewed reports.

The issues here have not changed from what they were on February 22, 1982, when I issued a decision denying a motion for summary judgment in the class action. In addition to the prison documents describing macing incidents and affidavits of inmates and guards considered in connection with the motion, I have now heard testimony from both sides regarding several macing incidents.

Robert Mallory testified that he was maced on February 4, 1981, while locked in his cell. Mallory refused to return his plastic meal tray. He placed the tray on his bed, went to the back of his cell and sat down. He was not violent, did not make threats, and had no weapons. He was ordered to return the tray. When he refused, he was maced. The next day, Mallory again refused to return a meal tray. This time, guards, dressed in riot gear, entered his cell and retrieved the tray without incident.

Laron McKinley was maced on November 24, 1980, for refusing to move a book which was preventing the closing of an outer wooden cell door. McKinley was locked behind metal doors at the time. McKinley was also maced on September 26, 1980, while he was locked, naked, in a small strip cage. He had refused to spread his buttocks for a search.

Soto, the individual plaintiff in 80–C–321 and a member of the class in 80–C–146, was maced on December 13, 1979, while he was locked in a cell and handcuffed. Soto had refused to be double-celled with another inmate whom Soto considered dangerous. William McAdoo was maced on October 11, 1980, for throwing milk on a correctional officer.

All in all, according to prison incident reports, about 130 macing incidents occurred between January 19, 1979 and November 16, 1982. The incidents differ, of course, in the degree of disruptive conduct exhibited by the inmates and in the amount of mace used by the officers. The defendants do not seriously dispute the facts; rather, they state that in each case direct orders were given the inmates—for instance, to return a tray, remove a book, submit to a strip search or come to the front of the cell to be cuffed. When the orders were disobeyed, according to the defendants, "mace was applied" to force compliance.

Plaintiffs argue that the use of mace under the circumstances described in this record are in violation of their Eighth Amendment right to be free from cruel and unusual punishment. They also claim that the macings are in violation of the regulations of the State of Wisconsin under which the prison operates and that, therefore, the use of mace violates the inmates' rights under the Fourteenth Amendment. Defendants argue that their use of mace is proper under the Eighth Amendment; that the plaintiffs have no liberty interest in the defendants' observation of their own administrative regulations, so that no due process claim exists; and that even if such a claim existed, defendants are acting within in the regulations.

Cases involving the use of chemical agents in prisons reveal the reluctance of the federal judiciary to get involved with the administration of state prisons. They show a recognition on the part of judges that prison officials are in a difficult and dangerous business. See, for instance, *Hendrix v. Faulkner,* 525 F.Supp. 435 (E.D.Ind. 1981), and cases cited therein.

The decision of February 22, 1982, reflects my reluctance to be involved with the administration of the prison at Waupun and a recognition of the difficulty of running a prison. At that time I stated that it was a short step from the case law regarding mac-

ing to the "conclusion that the Incident Reports in the record may, in some instances, reveal that mace is employed in a manner not sanctioned by the Eighth Amendment to the Constitution." p. 10. I also stated that defendants' conduct was likely to be found in violation of their own regulations. A preliminary injunction was denied, however, on the basis that to grant it would disserve the public interest:

"Because of the serious and difficult tasks faced by defendants to this action, I am convinced that the public interest is served by allowing them time to reevaluate their interpretation of their regulations before being faced with a federal court order." p. 11.

So far as I can tell, the decision of February 22, 1982, has had no effect on defendants' views. Consequently, I must set aside my reluctance to become involved in the administration of the prison and my hope that the defendants would recognize that regardless of their personal views, the law, while not entirely clear, requires curbs on the use of chemical agents. The point has come to be certain that the constitutional rights of the inmates are not being violated.

The Eighth Amendment prohibits punishment which is incompatible with "evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1978). The use of chemical agents in prisons has required courts to consider whether its use is compatible with contemporary attitudes toward what constitutes cruel and unusual punishment. Some courts have sanctioned the use of tear gas and other chemicals. See *Bethea v. Crouse,* 417 F.2d 504 (10th Cir.1969); *Washington v. Anderson,* 387 F.Supp. 412 (E.D.Okl.1974). Other courts in later cases have taken a close look at the physical effects of chemical agents and have determined that under some conditions their use violates the Eighth Amendment. See *Spain v. Procunier,* 600 F.2d 189 (9th Cir.1979).

Two fairly recent decisions from the Court of Appeals for this Circuit have recognized the trend toward restricting the use of chemical agents. In *Stringer v. Rowe,* 616 F.2d 993, 999 (7th Cir.1980), the court pointed out that while courts in the past have sanctioned the use of chemical agents when reasonably necessary, recent decisions have "emphasized that use of chemical agents such as tear gas and mace by prison officials to subdue individual prisoners, rather than to quell large disturbances, should be more restricted."

In *Lock v. Jenkins,* 641 F.2d 488 (7th Cir.1981), the court considered the use of tear gas and other chemical disabling agents on pretrial detainees. The analysis proceeded under the Fourteenth, not the Eighth Amendment. However, the court implied that the issues posed were the same. Relying on *Stringer, supra* and *Spain, supra,* the court concluded that only in "rare occasions" would it be appropriate to use chemical agents to control inmates already confined in their cells. In *Lock, supra,* the record shows that the inmates were engaged in "inciting to riot at a time of tremendous tension in the prison following an attempted escape and the taking hostage of the prison Warden and several others." The court concluded:

"We believe that the facts shown regarding this institute constitute one of the rare occasions when the use of tear gas against persons locked in cells was not unjustified." At 496.

However, as to other incidents revealed in the record, the conclusion was contrary. The use of gas to retrieve a metal food tray was found to be constitutionally impermissible. Also impermissible was the use of a chemical agent to stop inmates from shouting and uttering threats:

"We have also found unconstitutional the use of a chemical agent to stop unpleasant but not threatening behavior by safekeepers locked in their cells." At 500.

These cases do not offer clear guidance in all situations as to when the use of mace is justified and when it is not. They do, however, indicate that some of the incidents in the record before me describe conduct which violates the Eighth Amendment. The incidents involve macing of inmates

locked either in a cell or a strip cage. There appears to be no recognition on the part of the defendants that such macing is highly questionable. For the most part, there appears to be no indication that the capacity of an individual inmate for violence is considered in determining whether mace is used. A blanket statement that the individuals in the Adjustment Center are the most troublesome in the prison system is not an adequate substitute for looking at the individual case. Prisoners who one day may be walking free in the yard can commit an infraction of prison rules and the next day be locked in cells in the Adjustment Center. In addition, the fact that one day inmate Mallory was maced for not returning his food tray and the next day he was not maced for the same action shows the apparent arbitrary nature of the decisions.

In many cases the conduct on the part of the inmates is passive. Stopping the inmates' conduct could in no way be characterized as urgent. Also, some of the reports involved macing for yelling and shouting, macings prohibited by *Lock*. Thus, even though the requirements of the Eighth Amendment are not entirely clear under the case law, some of the macings revealed in this record are violations of the constitutional rights of the inmates involved.

The Wisconsin Administrative Code provides somewhat more specific guidelines for Wisconsin prison officials. H.S.S. § 306.08 provides that chemical agents can be used only in two situations: (1) to subdue an inmate who poses an immediate threat of injury or death to another, and (2) to regain control of an institution or part of an institution. The regulations also provide that the use of chemical agents "shall be authorized only by the Superintendent." Plaintiffs argue that defendants have violated these regulations and therefore have also violated the inmates' due process rights under the Fourteenth Amendment. Defendants argue that "there is no basis in the record that the plaintiffs had an expectation of a liberty interest in defendants' observation of their own administrative regulations...." Brief, p. 22. In support of

this proposition, defendants cite *Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982).

Defendants' argument must be rejected. A state can create a liberty interest "by statute, by rule or regulation." *Meachum v. Fano,* 427 U.S. 215, 229, 96 S.Ct. 2532, 2540, 49 L.Ed.2d 451 (1976). The Court of Appeals for this Circuit has stated that "a prisoner may have due process rights as a result of entitlements created by prison regulations...." *Arsberry v. Sielaff,* 586 F.2d 37 (7th Cir.1978); *Stringer, supra.* The court again recognized this principle in *Shango, supra.* There the court stated, however, that not every official pronouncement spawns a protectible right; specifically, state granted *procedural* rights may not in themselves create a liberty interest. *Shango* involved interprison transfers. The state retained total discretion to transfer inmates between institutions for any reason whatsoever. The state-created right to have a hearing regarding a transfer did not alter the state's discretion. Therefore, there was no "parent substantive right" underlying the procedural right. The analysis is different if the state provides a substantive right.

In *Olim v. Wakinekona,* —— U.S. ——, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), the court stated:

"... A state creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show 'that particularized standards of criteria guide the state's discretion' ..."

In *Olim,* the court cited with approval the distinctions drawn in *Shango.*

In *Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the court recognized the fact that a state may create a liberty interest through enactment of statutory or regulatory measures. Even though the court cautioned that not every regulation governing the administration of a prison must be treated as creating a liberty interest, the regulation at issue in that case was found to provide a protectible interest. Similarly, the Court of Appeals

for this Circuit in a decision post-dating *Shango, supra,* discussed an Illinois law requiring that persons receiving treatment under its Mental Health Code be treated "in the least restrictive environment." The court stated that "This is a state-created liberty interest ... *Johnson by Johnson v. Brelje,* 701 F.2d 1201, 1205 (7th Cir.1983)." Thus it is clear that if a state places limitations on official discretion, it in all likelihood has created a liberty interest.

■ The nature of the interest involved rather than its weight is the determining factor in a decision as to whether a liberty interest is involved. In *Meacham v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), the court determined that in the absence of a state law, interprison transfers did not implicate a liberty interest because a prisoner's expectancy of remaining at a particular institution is "too ephemeral and insubstantial." The same approach may be appropriate in determining which regulations or laws create liberty interest. See *Hewitt, supra.* In the present case the interest is substantial. The state has limited the discretion of prison officials in the use of agents, the abuse of which can constitute cruel and unusual punishment. These regulations create a liberty interest. The inmates in the Wisconsin prison system have a liberty interest in not being subjected to the use of chemical agents except as set forth in the Wisconsin Administrative Code.

The question then becomes whether defendants are in fact violating their regulations. They claim that they are not. They draw fine distinctions, stating that no inmate is maced because, for instance, he refuses to return a meal tray; rather he is maced because he disobeys a direct order to return a tray which could result in "his having to be physically restrained or which could result in a physical confrontation between the inmate and correctional officers to seek compliance with orders and to coerce cooperation prior to the necessity of using actual force." They argue that if officers must enter a cell to obtain compliance with an order to return a tray, for example, there is an immediate threat of bodily injury which, under the regulations, justifies the use of a chemical agent. The argument turns on the possibility that a seemingly passive inmate may attack officers who enter the cell and that someone may be hurt. Thus, in defendants view, the requirement is met that mace can be used only to "subdue an inmate or inmates who pose an immediate threat of bodily injury or death to another." Additionally defendants argue that because an inmate in a cell is refusing a lawful order, control over that cell is lost and mace is appropriately used "to regain control of an institution or part of an institution."

It is highly questionable whether the fact that something *may* happen that *may* result in injury equals an immediate threat. It is questionable whether when defendants act first, they can be said to be subduing an inmate. Furthermore, although the defendants state "chemical agents are a type of force," they seem, consciously or unconsciously, to consider the use of mace an *alternative* to "actual force." Several times in their brief this contrast becomes explicit. At page 23, defendants argue that "chemical agents, which are a substitution for force, are permitted to subdue an inmate or inmates...." At page 24, reference is made to the use of mace "prior to the necessity of using actual force." This attitude, which is evident in the testimony of prison officials, is contrary to the Wisconsin prison regulations.

■ It might seem that in some respects a factual question exists as to what sort of force mace is. The inmates see it as a very serious form of force. The defendants see it as a substitute for "actual force." Defendants state that "chemical agents are generally the most humane and least harmful method of dealing with obstinate and dangerous inmates...." However, the decision as to what chemical agents actually are is not an open one. Wisconsin Administrative Regulation HSS 306.06(a) defines force as follows:

"Force" is the exercise of strength or power to overcome resistance or to compel another to act or to refrain from

acting in a particular way. It includes the use of chemical, mechanical, and physical power or strength. Only so much force may be used as is reasonably necessary to achieve the objective for which it is used. The use of excessive force is forbidden.

As it should be, the use of chemical agents is included in the definition of force. The appendix to the rules further states:

Because chemical agents pose a risk of injury to others, resort to their use is made in limited situations.

Later it is pointed out in the appendix that there is a limitation on the use of chemical agents similar to the limitation on the use of firearms:

As with firearms, only the Superintendent may authorize its use.

Defendants' apparent attitude that chemical agents are not "actual force" is simply incorrect under either the regulations or the Eighth Amendment. Despite this, defendants in fact use mace in many cases as the first type of force used. That is, when a prisoner refuses to return a tray or to be moved, even before he makes any physically threatening gesture or statement, he may be maced. In other words, mace is used as a "first strike" weapon.

The clear implication of the regulations is that mace is a serious use of force. For purposes of illustration, if the use of mace were analogized to hitting an inmate with a baton, the excesses in its use as revealed in this record would be apparent. No one would argue that the prison officials could tell an inmate to return a tray and then tell him that if he refused, they would hit him once with a baton; if he continued to refuse that they would continue to hit him. The flavor of corporal punishment in that scene is clear, and the regulations prohibit corporal punishment. HSS 306.06(2). Yet when mace is used, defendants seem to feel that they are not using force at all or at least that they are being humane.

To say that they are incorrect is not to argue with them that the use of mace prevents danger to the correctional officers and is expedient. It is not to say that mace can never be used. It is not to disregard the interests of the officers in being unharmed on the job. But the regulations and the Eighth Amendment must be recognized as providing limits on the use of chemical agents. The almost routine use of chemical agents that I have observed in this case violates the inmates' rights under both the Eighth and the Fourteenth Amendments.

The order which will be issued in this case will follow in all respects the prison regulations. I will order that in a non-emergency situation [1] the regulations be strictly complied with. Prior to the use of mace, approval of the Superintendent must be obtained. The Superintendent may delegate that authority to Mr. Heeringa, the Assistant Superintendent of Security. However, the delegation of authority must go no lower into the ranks than Mr. Heeringa. I am personally impressed with Mr. Heeringa, and I am confident that he will properly exercise his authority and good judgment. I do not have that same confidence in lower ranking officers, especially those pulling long duty in the Adjustment Center.

Secondly, "to subdue an inmate who poses an immediate threat of injury" means that the inmate is at the minimum making physically threatening gestures. In some cases the throwing of items from the cells equals physically threatening gestures. Even if physically threatening gestures are made, however, if an inmate is locked in his cell, and certainly if he is locked in a strip cage, a careful judgment must be made as to whether less serious alternatives are available. Finally, "to regain control of a cell" does not mean to require an inmate to return a tray or to relinquish cigarettes or to spread his buttocks. Nor, under the case

---

1. Nothing in this record reveals anything about what would be done in an emergency, for no true emergencies are involved here. My order is not intended to apply to a situation in which, for instance, inmates are out of their cells, rioting, destroying property, or physically threatening correctional officers.

law, does it mean to force an inmate to stop shouting. In addition, the prison officials are required to comply with the regulations to allow the medical staff to treat inmates following macing incidents.

Lastly, I come to the question of damages in Mr. Soto's individual case. While I find that his rights have been violated, I also find that the individual defendants, although acting improperly, did not do so recklessly but rather acted in good faith, believing that their actions did not run afoul of the Constitution. Accordingly, individual damages will not be awarded. The relief here will be limited to the injunction to be granted. It goes without saying, however, that a good faith immunity defense will no longer be available to state agents after this decision is issued.

*Findings of Fact*

1. Plaintiffs are now, or at the commencement of this action were, inmates in the Adjustment Center of the Waupun Correctional Institution, Waupun, Wisconsin.

2. Defendant Elmer O. Cady was, at all times material, the Administrator of the Division of Corrections, Department of Health and Social Services, State of Wisconsin. Defendant Cady had the ultimate responsibility within the Division of Corrections for all policies, procedures, and correctional staff employed within the correctional institutions in Wisconsin, including the Waupun Correctional Institution. In May of 1983, Mr. Walter Dickey, Professor of Law of the University of Wisconsin Law School and a witness in this case, assumed the position held by Mr. Cady.

3. Defendant Thomas R. Israel is the Superintendent of the Waupun Correctional Institution. He is responsible for all policies, procedures, and correctional staff within the institution.

4. Defendant Gerald Heeringa is Assistant Superintendent of Security of the Waupun Correctional Institution. He is responsible for all security policies and procedures within the institution.

5. The Waupun Correctional Institution is a maximum security prison in the State of Wisconsin, and at the time of trial had a population of approximately 1,154 inmates. The approved designated capacity for the Waupun Correctional Institution is 810 inmates.

6. The Adjustment Center, the major segregation center within the institution, is a concrete and steel building containing 67 cells. 59 cells are arranged in 2 tiers on the main floor. The remaining 8 cells are in the basement. Each of the cells is approximately 7 feet wide by 10 feet long by 8 feet high. Three of the sides of each cell are solid concrete. The fourth side consists of a metal barred door. The ceiling and floor are concrete. 15 of the cells have a wooden outer door in addition to the metal barred doors and are commonly referred to as double door or wooden door cells.

7. The strip cage is a thick wire mesh cage in the Adjustment Center, which is approximately 4 feet wide by 4 feet long by 8 feet high. Strip searches of inmates are conducted in this cage.

8. The cells in the Adjustment Center do not have windows.

9. Inmates are sent to the Adjustment Center from the general population for disciplinary purposes and punishment resulting from violations of prison rules. The reasons an inmate may be sent to the Adjustment Center range from possession of contraband, theft, refusing to go to work, up to fighting with prisoners or staff.

10. Inmates are normally allowed to have cigarettes and matches in the Adjustment Center. Inmates are fed in the Adjustment Center 3 times a day. The meals are delivered by correctional officers on plastic trays and are served to the inmates while they are locked in their cells. Plastic eating utensils and paper cups are provided.

11. The average daily population in the 59 cells of the Adjustment Center since approximately the summer of 1982, is 80 inmates. Inmates are frequently double-celled in the Adjustment Center and, in fact, more than two inmates have been

placed in an Adjustment Center cell on a frequent basis during the last three years. At times, over 100 inmates have been held in the Adjustment Center.

12. The chemical agents presently used in the Adjustment Center are Chloroacetenophenone (CN) and Chlorobenzylmalononitrite (CS).

13. The CN used in the Adjustment Center is in a liquid form, and is a by-product of a kerosene-type substance which makes the CN stick to surfaces and persist. CN is sprayed from a canister. The canisters used in the Adjustment Center are approximately 2 inches in diameter, and about 5½ inches high. They contain approximately 4½ ounces of CN, which is equivalent to approximately 35 1-second bursts of CN. CN vaporizes upon contact with the human body and other surfaces.

14. Mace is a brand name used by one of the manufacturers of the CN which is available in the Adjustment Center.

15. CS is a stronger chemical agent than CN. CS is used in a powder or dust form and is often referred to as Federal Duster. CS dust is also disbursed from a canister.

16. A liquid form of CS was also used in the Adjustment Center during the period relevant to the lawsuit. The liquid form of CS, often called Federal Streamer, is no longer used in the Adjustment Center.

17. CN and CS are intended to have the immediate effect of disabling and incapacitating persons on whom they are discharged by causing pain and an intense and pervasive burning and tearing action.

18. The application and use of CN and CS may result in serious and permanent physical injury, especially to the eyes and skin, in the absence of immediate and competent medical attention.

19. The effects of CN and CS may be moderated by thoroughly cleansing and bathing the body, changing clothing and bedding, and ventilating the affected area.

20. The use of chemical agents in the Adjustment Center has increased dramatically in the past 4½ years.

21. From January 1, 1979 to November 4, 1982, approximately 130 macing incidents occurred in the Adjustment Center.

22. Most of the macing incidents involve situations where inmates were maced while locked in their cells or in the strip cage. Some incidents involved inmates who suffered the effects of mace used on another inmate.

23. "Macing Incident Reports" are written by correctional officers and are intended to contain most of the relevant information regarding the use of chemical agents on a particular occasion.

24. The defendants' policy concerning the use of mace in the Adjustment Center hasn't changed since the filing of the lawsuit or the rendering of the summary judgment decision in February of 1982.

25. Many states operate their prisons without the use of mace or chemical agents, except in extreme riotous situations.

26. The policy concerning the use of mace in the Adjustment Center was set by defendant Heeringa, and approved by defendants Israel and Cady.

27. The possibility of serious injury as a result of the use of chemical agents is greater when chemical agents are used in enclosed, poorly-ventilated areas such as a prison cell.

28. The first document issued by the Division of Corrections, Department of Health and Social Services, on the use of chemical agents was placed into effect on January 15, 1978, and stated that,

"Chemical agents for purposes of security and control shall be used only in *extra-ordinary circumstances* when a situation arises in which physical force would be otherwise necessary and unavoidable *to protect residents or staff from great bodily harm.*" (Emphasis added.) Ex. 136.

29. Most of the inmates who are placed in the Adjustment Center are respectful to officers, do their adjustment time and are returned to the general population.

30. Correctional officers have discretion to ignore some of the conduct of inmates in

the Adjustment Center without taking disciplinary action.

31. Some methods of dealing with inmate misconduct are to take a portion of the inmate's property away or to increase his adjustment time.

32. The most frequent kind of major conduct violations in the Adjustment Center are disrespect and disobeying orders.

33. The authority to approve the use of chemical agents in the Adjustment Center has been delegated by defendants to the lowest supervisory level.

34. Defendants' procedures for the use of chemical agents in the Adjustment Center do not require that the officer in charge create a show of force by gathering other correctional officers and suiting them up in Emergency Response Unit (E.R.U.) gear before chemical agents are used.

35. The E.R.U. gear includes a helmet with faceguard, a 4½ foot high, 2-man plastic shield, leg guards, supporter, jump suit and a wooden baton. This equipment is available for several of the guards in the Adjustment Center.

36. Defendants' policy in the Adjustment Center requires that chemical agents be used first against an inmate for refusing to obey an order. After the use of chemical agents, officers enter the cell dressed in E.R.U. gear.

37. The cells in the Adjustment Center are not cleaned after mace is used against the inmate while he was in that cell, except in the discretion of the supervisor present. In the Adjustment Center, decisions whether to allow inmates to shower or to change clothing and bedding after the use of chemical agents are also left to the discretion of the supervisor.

38. Chemical agents have been used to create and preserve an atmosphere of discipline in the Adjustment Center.

39. Chemical agents have been used in the Adjustment Center to gain compliance with non-emergency orders when the inmates against whom the agents are used are locked in their cells, handcuffed, or otherwise restrained.

40. Chemical agents have been used to seek compliance with an order to stop yelling obscenities.

41. Chemical agents have been used in the Adjustment Center against inmates who refuse orders to take medication.

42. Chemical agents have been used in the Adjustment Center against inmates who refuse an order to stop throwing liquids from their cells.

43. Chemical agents have been used in the Adjustment Center against an inmate for refusing to remove a book from the outer wooden door of an adjustment cell.

44. Inmate Robert Mallory was directly maced, in the eyes, on February 4, 1981, while he was passive and locked in his cell, for refusing to return his plastic meal tray. Instead of returning the tray, he placed it on his bed, went to the back of the cell and sat on the toilet or sink. He was not violent, made no threats against any of the guards, had no weapons and was not barricaded in his cell.

45. On February 5, 1981, Mallory followed the same pattern of conduct as on February 4, 1981. However, instead of macing Mallory on that date, several of the guards entered his cell dressed in E.R.U. equipment and retrieved the tray from the cell.

46. Inmate Mallory suffered the effects of mace as a result of the use of chemical agents against other inmates in the Adjustment Center, including April 16, 1980, when another inmate was sprayed with 4 cans of mace.

47. Inmate William McAdoo was directly maced on October 11, 1980, while he was passive and locked in his cell, for throwing some milk from a paper cup on a correctional officer. Inmate McAdoo was not violent, did not issue any threats against any correctional officers, had no weapons and was not barricaded in his cell.

48. Inmate McAdoo was not given a shower and the water in his cell was turned off for a period of time after the macing

incident, preventing him from ridding himself of the effects of mace.

49. On other occasions while inmate McAdoo was in the Adjustment Center, he suffered the effects of mace and chemical agents when they were used against other inmates.

50. Inmate Gregory Johnson is an asthmatic. He was never directly maced while in the Adjustment Center. However, on several occasions he suffered the effects of mace when it was sprayed against other inmates, including inmate Warren Washington on March 8, 1981.

51. Inmate Laron McKinley was maced on November 24, 1980, while he was passive and locked in one of the double-doored adjustment cells. On that date, he was maced for refusing to remove a book from the outer wooden door of the cell. The inner metal barred door was locked at all times. Inmate McKinley did not issue any threats against any correctional officers, did not possess any weapons in his cell, and was not barricaded in his cell.

52. Inmate McKinley was also maced on September 26, 1980, while locked in the strip cage. On that date, he was maced for refusing to spread his buttocks to complete a strip search procedure. At the time he was maced, McKinley was naked and had no weapons.

53. On other occasions, inmate McKinley suffered the effects of mace while he was in the Adjustment Center when mace was sprayed on other inmates.

54. Inmate Carlos Soto was maced on December 13, 1979, while locked in his cell and handcuffed. Inmate Soto was maced for refusing to double-cell with another inmate.

55. On other occasions while in the Adjustment Center, Soto suffered the effects of mace when it was sprayed against other inmates.

56. On various occasions, members of the plaintiffs' class suffered the effect of chemical agents but were denied medical treatment, an opportunity to shower or bathe, an opportunity to have the cell cleaned and ventilated, and to have their clothes, bedding, and mattress changed.

57. As a direct result of the conduct, policies and procedures of defendants and their agents and subordinates, inmates have suffered and will continue to suffer irreparable harm. Plaintiffs have been without and will continue to be without an adequate remedy at law. The balance of harms favors plaintiffs, and public policy requires that relief be granted to them.

*Conclusions of Law*

1. This action arises under the United States Constitution, particularly under the provisions of the Eighth and Fourteenth Amendments to the United States Constitution, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, § 1983.

2. This court has jurisdiction pursuant to Title 28 of the United States Code, § 1343(3).

3. This action is certified as a class action on behalf of all past, present and future residents of the Adjustment Center at the Waupun Correctional Institution.

4. The Waupun Correctional Institution, including the Adjustment Center, is being operated and maintained by defendants pursuant to state law.

5. At all times relevant to this action, the defendants were acting under the color and pretense of the statutes, ordinances, regulations, customs and usages of the State of Wisconsin, and under the authority of their offices.

6. All of the defendants and their subordinates and agents are bound by the Wisconsin Administrative regulations, including HSS § 306.08.

7. During the times relevant to this action, defendants and their subordinates and agents have used chemical agents in the Adjustment Center against the plaintiffs in

violation of plaintiffs' constitutional rights under the Eighth Amendment.

8. During the times relevant to this action, defendants and their subordinates and agents have used chemical agents in the Adjustment Center against plaintiffs in violation of plaintiffs' constitutional rights under the Fourteenth Amendment to the Constitution by using chemical agents in violation of the Wisconsin Administrative regulations—HSS § 306.08.

### INJUNCTIVE ORDER

The court finds that defendants, their agents, employees and subordinates have used or permitted the use of and are continuing to use or permit the use of chemical agents, including CN and CS, in the Adjustment Center of the Waupun Correctional Institution under circumstances which constitute cruel and unusual punishment to the plaintiffs in violation of the Eighth Amendment to the United States Constitution; that such use also have been and continues to be in violation of the administrative regulations of the State of Wisconsin, Department of Health and Social Services, specifically HSS 306.08, and that such use has been and continues to be in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; that plaintiffs have been and are continuing to be harmed, and the public interest and the equities of the situation require that the court now take action to permanently enjoin the defendants' wrongful conduct;

NOW, THEREFORE, IT IS ORDERED WITH RESPECT TO THE USE OF CHEMICAL AGENTS IN THE ADJUSTMENT CENTER OF THE WAUPUN CORRECTIONAL INSTITUTION:

1. Unless actual physical control of all or a portion of the institution has been lost, chemical agents, including CN and CS, may not be used except to subdue an inmate or inmates who pose a clear, immediate, actual and direct threat of bodily injury or death to another. Chemical agents may not be used:

(a) as an ordinary procedure or other than in extreme and exceptional cases;

(b) to control an inmate who is not violent unless the threat of violence is clear, immediate, actual and direct;

(c) to control an inmate who is locked in his cell, unless there is a clear, immediate, direct and actual threat of bodily injury or death to another;

(d) to control an inmate who is handcuffed or otherwise restrained unless there is a clear, immediate, direct and actual threat of great bodily injury or death to another.

2. The use of chemical agents is not appropriate to force an inmate's compliance with a non-emergency order where the inmate's refusal to obey the order is passive and non-violent. The mere possibility of a physical confrontation and the potential of a resulting bodily injury, absent a clear, immediate, direct and actual threat of bodily injury is insufficient to justify the use of chemical agents. It will ordinarily not be proper to use chemical agents in the following circumstances:

(a) when an inmate refuses to return a meal tray, cup, dishes or other eating articles; a refusal to return such an item, however, justifies the withholding of future food services to the inmate;

(b) when an inmate refuses to return contraband, such as cigarettes, unless it is contraband which may reasonably be considered, in its present form, to be a weapon;

(c) when an inmate throws an object, such as food, water, urine or feces, out of his cell;

(d) to quiet a prisoner;

(e) when an inmate refuses non-emergency medical treatment;

(f) when an inmate refuses to leave his cell to have it cleaned; and

(g) when an inmate refuses to spread his buttocks for a search in the strip cage where such refusal is passive and non-violent.

3. Chemical agents may never be used against an inmate if he is passive and non-violent.

4. Chemical agents may never be used to punish an inmate.

5. Whenever circumstances are such that the use of chemical agents is proper, the person authorizing their use shall give full consideration to the alternative use of other means of non-deadly force.

6. The use of chemical agents in non-emergency circumstances shall be authorized only by Mr. Israel or Mr. Heeringa.

7. Chemical agents shall not be used in amounts greater than necessary.

8. Chemical agents are to be used in accordance with the manufacturer's instructions.

9. Following each use of a chemical agent, all exposed inmates shall be examined by a competently trained member of the medical staff.

10. This ORDER regarding the use of chemical agents in the Adjustment Center of the Waupun Correctional Institution is to be in addition to those restrictions already set forth in HSS 306.08. Nothing herein should be construed to relieve any person of an obligation to fully, completely and in good faith comply with and implement all administrative procedures promulgated by the Division of Corrections, Department of Health and Social Services, State of Wisconsin, regarding the use of chemical agents to the extent they are not inconsistent with this ORDER.