**Harold L. SMITH, Plaintiff,**

**v.**

**John W. STONER, et al., Defendants.**

**Civ. No. F 82–364.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Sept. 6, 1984.

On Motion to Amend or Alter Judgment
Sept. 26, 1984.

Ernest M. Beal, Jr., Parrish, Knight & Beal, Fort Wayne, Ind., for plaintiff.

Joe A. Rowe, Rowe, Laur & Spindler, Kendallville, Ind., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. The case deals with alleged violations of the Fourteenth Amendment to the United States Constitution, brought pursuant to 42 U.S.C. § 1983. This court, having examined and considered the entire record and having determined the credibility of the witnesses, after viewing their demeanor and considering their interests, and being duly advised, hereby enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

The plaintiff, Harold L. Smith (Smith) is a resident of Noble County, Indiana and is a former employee of the Monsanto Corporation located in Ligonier, Indiana. Beginning on January 1, 1976 and continuing until December 31, 1982, the defendant, John W. Stoner (Stoner) was the duly elected, qualified and acting Sheriff of Noble County, Indiana. Beginning on January 1, 1983, and at the present time, the defendant, Donald R. Leitch, was the duly elected, qualified and acting Sheriff of Noble County, Indiana, and is being sued only in his official capacity as Sheriff of Noble County, Indiana. Jurisdiction and venue is present and is conceded by the parties.

On May 27, 1981, the Honorable Robert C. Probst, Judge of the Noble Circuit Court, without the intervention of a jury, found the plaintiff guilty on two counts of causing a death while driving a motor vehicle under the influence of alcohol. Following the conviction, a prolonged and extensive presentence investigation was conducted. Sentencing was delayed to allow the establishment of a specific work release program for Smith. On February 24, 1982, Judge Probst entered a judgment of conviction. Judge Probst imposed a five year sentence on each count, with both sentences to run concurrently; placed Smith in the Noble County Work Release Program for a period of five years; and committed him to the custody of the Sheriff of Noble County for placement in the Noble County Jail where a work release program was in operation.

The Noble Circuit Court ordered Smith to surrender to the custody of the Sheriff of Noble County, Indiana, on Saturday, February 27, 1982 to commence serving his sentence. It had been, and is, the practice and policy of Judge Probst that persons committed to the county jail will serve no more than a maximum of one hundred eighty (180) days. At the end of six (6) months and sometimes earlier, if such individual has abided by all the rules and regulations of the jail and is on a work release program, he or she will be released and placed on probation.

Stoner was not opposed to the concept of work release. However, Stoner did not believe felons should be placed on work release. He also had concerns about the administration of the program, with particular concern about sufficient jail personnel to implement the program. It was wholly

within the Sheriff of Noble County's discretion as to whether the work release program could be created or remain in existence.

**1.** At all relevant times, I.C. 35–50–6–4 provided as follows:

*Initial assignment to credit time classification.* (a) A person imprisoned for a crime or imprisoned awaiting trial or sentencing is initially assigned to class I.

(b) A person may be reassigned to class II or class III if he violates a rule of the department of correction or, if he is not under the custody of the department, a rule of the penal facility in which he is imprisoned. However, a violation of a condition of parole or probation may not be the basis for reassignment. Before a person may be reassigned to a lower credit time class, he must be granted a hearing to determine his guilt or innocence and, if found guilty, whether reassignment is an appropriate disciplinary action for the violation. The person may waive his right to the hearing.

(c) In connection with the hearing granted under subsection (b), the person is entitled to:

(1) Have not less than twenty-four (24) hours advance written notice of the date, time, and place of the hearing, and of the alleged misconduct and the rule the misconduct is alleged to have violated;

(2) Have reasonable time to prepare for the hearing;

(3) Have an impartial decisionmaker;

(4) Appear and speak in his own behalf;

(5) Call witnesses and present evidence;

(6) Confront and cross-examine each witness, unless the hearing authority finds that to do so would subject a witness to a substantial risk of harm;

(7) Have the assistance of a lay advocate (the department may require that the advocate be an employee of, or a fellow prisoner in, the same facility or program);

(8) Have a written statement of the findings of fact, the evidence relied upon, and the reasons for the action taken;

(9) Have immunity if his testimony or any evidence derived from his testimony is used in any criminal proceedings; and

(10) Have his record expunged of any reference to the charge if he is found not guilty or if a finding of guilt is later overturned. Any finding of guilt must be supported by a preponderance of the evidence presented at the hearing.

(d) A person may be reassigned from class III to class I or class II or from class II to class I. A person's assignment to class III or class II shall be reviewed at least once every six (6) months to determine if he should be reassigned to a higher credit time class.

◼ The court takes judicial notice of I.C. 35–50–6–4,[1] I.C. 35–50–6–5,[2] and I.C. 35–50–6–5.5.[3] The court also takes judicial notice of I.C. 11–12–4–3,[4] I.C. 36–2–16–3 [5]

**2.** At all relevant times, I.C. 35–50–6–5 provided as follows:

*Violations—Deprivation of credit time—Hearing—Restoration.*—(a) A person may, with respect to the same transaction, be deprived of any part of the credit time he has earned for violation of one (1) or more rules of the department of correction or, if he is not committed to the department, one (1) or more rules of the penal facility in which he is imprisoned. However, the violation of a condition of parole or probation may not be the basis for deprivation. Whenever a person is deprived of credit time, he may also be reassigned to class II or class III.

(b) Before a person may be deprived of earned credit time, the person must be granted a hearing to determine his guilt or innocence and, if found guilty, whether deprivation of earned credit time is an appropriate disciplinary action for the violation. In connection with the hearing, the person is entitled to the procedural safeguards listed in section 4(c) [35–50–6–4(c)] of this chapter. The person may waive his right to the hearing.

(c) Any part of the credit time of which a person is deprived under this section may be restored.

**3.** At all relevant times, I.C. 35–50–6–5.5 provided as follows:

*Reassignment to lower class or deprivation of credit time—Review.*—A person who has been reassigned to a lower credit time class or has been deprived of earned credit time is entitled to a review of the decision by the commissioner of the department of correction or the sheriff.

**4.** At all relevant times, I.C. 11–12–4–3 has provided as follows:

*Rules for maintenance of order and discipline.* —The county sheriff shall adopt rules for the maintenance of order and discipline among persons committed to the county jail. These rules must describe the conduct for which disciplinary action may be imposed, the type of disciplinary action that may be taken, and the disciplinary procedure to be followed. The rules and possible disciplinary action must be made available to all persons committed to the county jail. The disciplinary action imposed must be proportionate to the seriousness of the violation.

**5.** At all relevant times, I.C. 36–2–16–3 has provided as follows:

and I.C. 34–2–62–1.[6] All of the acts complained of herein occurred under color of state law.

On February 27, 1982, Smith surrendered himself to the Noble County Sheriff to start the service of his sentence. Smith left the confines of the Noble County Jail five days a week, from approximately 2:45 p.m. until approximately 12:45 a.m., in order to attend employment. Smith visited his psychologist in Fort Wayne, Indiana, once a week. While Smith was an inmate at the Noble County Jail, and in accordance with the terms of his sentence, Smith was subject to the rules and regulations contained in the "Noble County Jail Inmates Handbook." Plaintiff's Exhibit 1.

On June 17, 1982, five notices of alleged jail rule violations by Harold Smith were issued. All five notices were signed by the Senior Jail Commander, Michael A. Lawson, Sr., on June 13, 1982. Jail Commander Lawson was not a witness to any of the incidents. Three of the notices charged violations of Major Rule 2, harassing inmates, and were accompanied by case reports prepared by the Jail Commander. Plaintiff's Exhibits 9, 10, 12, 13, 15. The other two notices charged violations of Major Rule 1, assaulting another inmate (Jimenez incident) and Major Rule 9, making a sexual proposal to an inmate (Ratliff incident). Case reports were also given to Smith regarding these incidents. Plaintiff's Exhibits 7, 8, 18, 19. Plaintiff received no written statements from the complaining parties.

The date of the Jimenez incident was alleged to be June 10, 1982, although Commander Lawson stated that the date of June 10, 1982 was the date the complaint was made to him. The time of the incident was unknown. The date and time of the Ratliff incident was alleged to be "unknown." These facts appeared on the case reports. Plaintiff's Exhibits 8, 19.

Each notice of jail rule violation detailed the basic rights required by state law to be given to a person accused of violating a rule of the penal facility in which he is imprisoned. Those basic legal requirements are set forth in I.C. 35–50–6–4(c) and I.C. 35–50–6–5.5. Some of those basic rights are also set forth in the Noble County Jail Inmate Rules of Conduct Handbook, developed, as required, by state law, I.C. 11–12–4–3, and in the State of Indiana Department of Correction Adult Authority Disciplinary Policy Procedures Handbook. Plaintiff's Exhibit 1 at page 1; Plaintiff's Exhibit 6, ¶ 14. The five notices also informed Smith that a hearing on the matters would be conducted on June 22, 1982 at 8:00 p.m. Plaintiff's Exhibits 7, 9, 12, 15, 18.

The Noble County Jail Inmate Rules of Conduct Handbook provides, in pertinent part:

> Violation of rules will be reported in writing to the senior or commanding officer on duty (Officer in Charge) within 24 hours. Any officer or matron at his or her discretion may place any inmate in isolation pending a hearing without approval from the Officer in Charge for violation of the rules and regulations. The reason and circumstances of any inmate being disciplined shall be reviewed within 24 hours by the Sheriff or his designee.

> If the officer reviewing said discipline believes the violation is of a nature that the inmate should be reclassified as to credit time, he may submit the charges to a hearing officer within ten (10) days of the incident.

. . . . . .

(a) A deputy [sheriff] appointed under this chapter may perform all of the duties of the officer who appointed him and is subject to the same regulations and penalties as the officer.
(b) The officer appointing the deputy is responsible for all the official acts of the deputy.

6. I.C. 34–1–62–1 provides:
 Every charge of incest, homosexuality, beastiality, fornication, adultery, or whoredom falsely made against any person, is actionable in the same manner as in the case of slanderous words charging a felony.

A request for review of the decision of the hearing officer must be made in writing to the Sheriff or his designee within seventy two (72) hours of the decision. The Sheriff or his deisgnee [sic] may reduce the amount of penalty of the disciplinary action but may not increase it. Plaintiff's Exhibit 1 at p. 1. When implementing these rules, the Sheriff's Department customarily refrains from issuing charges on stale events and trivial matters. All of the incidents occurred more than twenty-four (24) hours before they were reported to the Officer in Charge and more than ten (10) days before the Reviewing Officer submitted the charges to the Hearing Officer.

After Smith received the notices of jail rule violations and the accompanying case reports, he was segregated from the work release cell. Smith was placed in a single person cell. Smith remained in a single person cell throughout the proceedings which followed. Smith was removed from the work release program prior to his hearing. Thus, he was not permitted to go to work at Monsanto prior to his scheduled hearing date of June 22, 1982.

In his "Sheriff's Weekly Report of Persons Confined in Jail," dated June 19, 1982, Stoner listed Smith's work release as "cancelled" and also noted that Smith was undergoing a conduct investigation. Plaintiff's Exhibit 3(b). Stoner used identical language in describing Smith's status in his weekly report dated June 26, 1982. Plaintiff's Exhibit 3(c). These weekly reports were the means by which Judge Probst, who had sentenced Smith, learned of the problem which had arisen regarding Smith and his presence in the work release program at the Noble County Jail.

Smith contacted his employer, Monsanto, the morning after he received the notices of alleged violations of jail rules. Smith believed, after Stephen Stoner had spoken with the Monsanto representative on the telephone, that he had a leave of absence of some kind. Smith's belief was based on statements made to him by Stephen Stoner after Stephen Stoner had spoken with the Monsanto representative. In fact, Smith had not obtained any type of leave of absence from his employment at Monsanto. Monsanto terminated Smith from its employment, effective June 29, 1982, due to Smith's absence from eleven consecutive scheduled days of work. Plaintiff's Exhibit 28. Plaintiff knew that if he did not have a leave of absence, he needed to speak with Monsanto every day regarding his attendance because unexplained, unreported absences led to termination of employment. Smith was not able to contact Monsanto again after the morning of June 17, 1982. Stoner notified Monsanto on June 29, 1982, that Smith's work release had been cancelled.

In the intervening days between June 17, 1982 and June 22, 1982, Smith was not able or allowed to make any type of investigation of the five pending violations against him nor was he able to speak with any of the persons who had brought complaints against him. He was not told jail policy dictated that requests for either a lay advocate or witnesses had to be made in advance of any hearing and in writing, using forms the jail had for such requests. Plaintiff requested that his attorney be present. As a matter of jail policy, Smith was not allowed to use his privately retained counsel to advocate his cause regarding these accusations. Plaintiff did confer with one of his attorneys prior to the scheduled hearing. His attorney was unable to explain what Smith needed to be aware of in order adequately to defend himself and to refute the allegations in the short conference held. The attorney believed he could have demonstrated Smith was not guilty of the charges if he had been allowed to be present to represent Smith on June 22, 1982.

Conduct Adjustment Officer, Floyd Reinhart, a Deputy Sheriff, conducted the hearing on June 22, 1982. The officer made no attempt to determine if the charges were timely. The Conduct Adjustment Officer made no notes of the testimony given and no recording was made of the evidence. None of the jail rule notices, case reports,

witness statements or testimony were made under oath. Received into evidence before this court were four of the five forms the Conduct Adjustment Officer used in making his rulings on the complaints which had been brought against Smith. Plaintiff's Exhibits 20–23.

On each of the forms used by the Conduct Adjustment Officer listed as testifying were: Lloyd Brumbaugh, Armando Jimenez, Gary Nichols, Robert Ratliff, and Kirk Wogomon. Smith is not listed as testifying at the hearing of June 22, 1982, but, Smith did testify in his own behalf. That fact is not reflected anywhere in any of the forms the Conduct Adjustment Officer used. Although the forms are labeled "Conduct Adjustment Officer's Findings," there are no findings made on the forms nor is there a place on the form for any findings. The forms only reflect the conclusions of the Conduct Adjustment Officer and the punishment imposed. It is not reflected on the forms which person testified about what violation. It is also not reflected in any of the forms whether Smith was allowed to cross-examine the witnesses regarding any of the facts an individual witness testified to under questioning by the Conduct Adjustment Officer.

Smith did ask questions of all of the witnesses testifying. However, his questioning of Gary Nichols was limited to the specific charges Nichols had brought. Smith could only ask Nichols about his specific complaint, not Nichols' statements regarding the Jimenez incident. Nichols admitted at the June 22, 1982 hearing that he was asleep when the actual Jiminez incident occurred. Smith had not consulted with his attorney in a manner sufficient to afford Smith the opportunity meaningfully to cross-examine the witnesses or meaningfully to challenge any evidence which might come in. Smith had no lay advocate and had no witnesses other than himself. Rhinehart informed him he needed to have made his requests earlier, on forms the jail had for that purpose. Smith would have used a lay advocate and called witnesses if he could have so done.

The witness statements which the Conduct Adjustment Officer did have were not introduced into evidence and were not shown or given to Smith until after the hearing had been conducted, completed and a decision made by the Conduct Adjustment Officer. Smith and Reinhart did not have the same records from which to work or upon which to base their questions, if any, at the hearing.

Immediately following the hearing, in Smith's presence, Officer Reinhart found Smith not guilty of the three alleged violations of Major Rule 2, harassing inmates in the Noble County Jail. Plaintiff's Exhibits 22, 23. Officer Reinhart made no immediate decisions on the remaining two alleged violations of violating Major Rule 1, assaulting another individual and Major Rule 9, making sexual proposals. Reinhart thereafter found Smith guilty of the two violations. Plaintiff's Exhibits 20, 21.

The incident underlying the alleged violation of Major Rule 1 is the Jimenez incident. Jimenez was apparently struck on the arm by a recently extinguished match. The incident occurred within the work release cell between Smith and Jimenez. Jimenez was not seriously injured. The Jimenez incident also involved an apparent small fire which occurred as a result of the interplay between Smith and Jimenez in the work release cell. The Jimenez incident apparently occurred at least a month prior to June 10, 1982. The alleged incident which formed the basis for the alleged violation of Major Rule 9 involved the exchange of words of sexual connotation between Smith and Robert Ratliff. The date of this incident was unknown although all agreed it had occurred weeks before the complaint was made. The incident apparently involved a statement made by Smith to Ratliff following a statement by Ratliff to Smith. Horseplay, joking exchanges, rough language, and words which carry sexual connotations are common practices engaged in and used by the inmates of the Noble County Jail.

The Conduct Adjustment Officer also decided the appropriate sanctions to be meted

out against Smith because of his conclusion that Smith was guilty of violating Major Rule 1 and Major Rule 9. The sanctions were stated on the same form that contained the summary conclusion that Smith was guilty of violating Major Rule 1 and Major Rule 9. Without any explanation, the Conduct Adjustment Officer imposed several sanctions upon Smith for the two violations. As a sanction for Smith's violation of Major Rule 1, the Conduct Officer imposed the sanction of reduction to Credit Time Class III, and "loss of all good time retroactive to February 27, 1982. Also Mr. Smith is to be removed from work release program." Plaintiff's Exhibit 20. The Conduct Adjustment Officer imposed the identical sanction for Smith's violation of Major Rule 9. Plaintiff's Exhibit 21.

The forms containing the Conduct Adjustment Officer's summary conclusions were presented to Smith on June 23, 1982, along with the written statements of the complaining parties of the three allegations of violating Major Rule 2, on which Smith was found not guilty, Plaintiff's Exhibits 11, 14, 17. At no time did Smith ever receive the written statements, if such existed, of the complaining parties who accused Smith of violating Major Rule 1 and Major Rule 9. The Conduct Adjustment Officer, inexplicably, adopted the three witness statements given in support of the three charges on which the Conduct Adjustment Officer found Smith not guilty which did exist as his findings of fact on the two guilty conclusions. The Conduct Adjustment Officer gave no other written statement of the factual findings, no summary of the evidence relied upon and no specifications of the rationale for his decision or for his sanctions. His decision was merely recorded in a summary fashion, by checking a box marked "guilty," on a standard jail form. Smith asked the Conduct Adjustment Officer for findings of fact, which clearly was his right. *See* I.C. 35–50–6–5.5. *See, e.g.,* Plaintiff's Exhibit 7 at paragraph 3(8). Plaintiff was informed that the witness statements, such as existed on unrelated, unmeritorious violations, were the Conduct Adjustment Officer's findings of fact.

In accordance with the rights set forth in the notices of jail rule violations, Smith timely requested a review of the "findings" of the Conduct Adjustment Officer on both of the violations. Plaintiff's Exhibits 25, 26. Stoner was the reviewing officer. Stoner had ordered the investigation of all the charges. Stoner conducted the review on June 26, 1982. He issued a report with respect to his review on June 27, 1982. Plaintiff's Exhibit 27.

Stoner's review was a review only of procedure. Stoner was looking at the timeliness of the steps of the procedure used, which were, on their face, untimely. Stoner made no substantive review. The administrative record which Stoner reviewed contained the notices alleging the five violations, the three unrelated statements with respect to the facially unmeritorious charges on which Smith was found not guilty, the summary adjudications of guilt upon the remaining two violations. Stoner had no record of the testimony, no notes from the hearing officer, no oral report from the hearing officer as to the contents of the hearing, no written statement of the findings of fact and evidence relied upon except for the forms submitted by the Conduct Adjustment Officer, no knowledge of the evidence received at the hearing, and no information concerning the actual procedures which occurred at the hearing of June 22, 1982. Stoner did not know if plaintiff had the opportunity to cross-examine witnesses, but he felt such knowledge was not relevant to a review. Stoner opined that if such information was relevant the form would provide a space for such information and the Conduct Officer would have noted that information on the form.

Stoner, in his report, following the basic outline of rights set forth in the notices, concluded that Smith had been provided and allowed each and every right listed in the notices, including the right of cross-examination. Stoner arrived at that conclusion without any actual knowledge of what

occurred at the hearing. There was no actual review, as required by state law and jail policy, of either the form or the substance of the hearing. Smith, therefore, received no review of the actions taken by the Conduct Adjustment Officer.

Stoner affirmed the Conduct Adjustment Officer's conclusions with respect to the Conduct Officer's findings of guilt on plaintiff's alleged violations of Major Rule 1 and Major Rule 9. However, Stoner reduced the sanction the Conduct Adjustment Officer imposed for the guilty finding on Major Rule 9 by reducing the reduction in credit class from class III to class II. Plaintiff's Exhibit 27. In all other respects, Stoner affirmed the sanctions imposed for the alleged violations of Major Rule 1 and Major Rule 9. Stoner also stated that the sanctions for the violations of Major Rule 1 and Major Rule 9 would run concurrently.

In examining the sanctions imposed, Stoner utilized Appendix One of the State of Indiana Department of Correction Adult Authority Disciplinary Policy Procedures (D.O.C. handbook). Plaintiff's Exhibit 6. Appendix One sets forth the maximum allowable penalties for various offenses within each category. Nowhere in state law or in the D.O.C. handbook or in the Noble County Jail Inmate's Handbook does it state that removal from work release is mandatory upon a finding that an inmate on work release is guilty of a violation of a major rule of conduct as set forth in the Noble County Jail Handbook. Stoner stated in his review of the two guilty findings that removal from work release was mandatory. It appears that the Conduct Adjustment Officer and Stoner both had the authority and discretion to impose a variety of sanctions upon Smith short of removing Smith from work release. These were the first violations by Smith. Stoner knew what the practical effect of the tripartite sanctions for the two violations would be, particularly the sanction of removal from work release. The affirmance of the guilty findings and the sanctions imposed for those guilty findings upon Smith, with the modification noted above, resulted in the *de facto* resentencing of Smith by Stoner.

Thereafter, proceedings were commenced in the Noble Circuit Court before the Honorable Robert Probst to modify Smith's sentence. The administrative records were placed in the public record. The charges of misconduct were reported by the local media. Stoner did not purposefully disseminate the substance of the administrative record. Smith sought review of the procedures by, as well as the reasons for, which his participation in the work release program had been curtailed in the Noble Circuit Court. At Stoner's request, as an intervenor, the Noble Circuit Court ruled that it was without jurisdiction, as a matter of Indiana law, to review Stoner's actions. Judge Probst felt that the decision, by the Sheriff of Noble County, to remove Smith from work release because of the findings of violations of major rules of conduct within the jail, was conclusive and binding upon the court. The judge scrupulously avoided reviewing, in any manner, the determination that major rules of the jail had been violated by Smith. Judge Probst would have granted plaintiff's motion for shock probation only if, after hearing what had transpired at the jail, but without reviewing what had transpired, the judge concluded there was absolutely nothing to the accusations. Finding itself estopped from reconsidering the matters which led to the hearing in the Noble Circuit Court, the Noble Circuit Court ordered Smith's incarceration in state confinement facilities under the jurisdiction of the Indiana Department of Corrections. This hearing before the Noble Circuit Court occurred July 15, 1982.

Following the proceeding in the Noble Circuit Court which resulted in Smith being resentenced to a facility run by the Indiana Department of Corrections, Smith received, while incarcerated in the Noble County Jail awaiting transfer to the Indiana Department of Corrections, a newly created document, marked "Written Statement of the Findings of Fact," prepared by the Conduct Adjustment Officer with respect to the disciplinary actions taken. Plaintiff's Exhibit 29. This document reported that the evi-

dence relied upon in support of the two rule violations on which Smith had been found guilty included the three unrelated written statements offered in connection with the charges upon which Smith was found not guilty, the fact that five (5) inmates testified (although there actually were six (6) who testified) and the fact that violations were reported by the inmates involved.

According to this written statement the finding of guilty on the violation of Major Rule 1 was apparently based on confirmation by an inmate other than the inmate specifically involved, even though the inmate specifically involved (Jimenez) testified at the hearing. The written statement also stated that Smith had been removed from the work release program "because people who violate major rules of the Noble County Jail do not qualify for the work release program." There is nothing before this court, other than this statement, which supports that conclusion, either in written or oral form. On the advice of counsel, Smith refused to sign the document, but did accept it. That written statement also alleged that Smith did not ask for a lay advocate, did not ask for witnesses, and was not refused the opportunity to cross-examine witnesses at the time of the hearing. Almost two months had elapsed between the hearing and the presentment of this written statement with Smith being resentenced in the interim.

Smith was transferred to the Indiana Department of Corrections, to the Indiana State Farm. While so incarcerated, his liberty was substantially curtailed, his contact with members of his family was impaired, and his income was diminished. At the Greencastle facility, Smith's prisoner status, within the minimum time permitted, was changed from class III to class I. Upon being advised as to Smith's restoration to class I status, Judge Probst immediately ordered Smith transferred from the State Farm to Noble County. On March 10, 1983, after hearing, Smith received a modification of his sentence, suspending the balance of the term and placing him on probation for five (5) years.

The Monsanto Corporation had open employment periods of approximately one month in the months of February, August and November of 1983. At each period of time opened for applications in 1983 at Monsanto Corporation, it received in excess of 400 applications. A person applying for employment at Monsanto must reapply each time a specific period is opened for applications of employment. The first time Smith was available to reapply at Monsanto for employment was August of 1983.

As an applicant for rehire at Monsanto, Monsanto would look at Smith's past record. Monsanto hires on a competitive basis; if there are any indications that an employee had any problems while employed, on application for rehire, Monsanto is likely to choose the candidate or applicant who appears not to have any problems. When a person leaves employment with the Monsanto Corporation a report on termination is made. A recommendation on rehire is made at that time; however, it is not a final decision.

The recommendation on rehire which appears on the report on termination which goes into a terminated employee's file is a subjective judgment made by the terminated employee's supervisor. The decision on whether a supervisor recommends someone for rehire is basically whether the supervisor would want that individual rehired at Monsanto on a competitive basis with a new applicant pool. There are circumstances where a supervisor might recommend that a person not be rehired for events or circumstances for which they had never been disciplined at Monsanto. In other words, it is possible that a person could continue in employment at Monsanto and be considered an individual Monsanto would not hire on a competitive basis with a new applicant pool.

With specific regard to Smith, the Superintendent of Personnel for Monsanto believed that, in a comparative process, Smith would "come up short." The Superintendent of Personnel based that opinion on the information in the personnel file; there is negative information in Smith's personnel

file. The negative information is such that while the information is not sufficient to have caused Smith to be discharged because of the information, it would impair his reemployment if Smith made an application for rehire. Smith, by virtue of his not submitting a written application, has not been under consideration for employment by the Monsanto Corporation. Smith would have remained an employee of Monsanto if his work release had not been cancelled and would have limited prospects of reemployment even if he reapplied at Monsanto. But for the removal from work release, Smith could be employed at Monsanto today, if Smith had gone to work and followed the rules of Monsanto as he had done in the past.

Smith obtained employment, after his release in March of 1983, on September 12, 1983. His lost wages and fringe benefits from June of 1982 when his work release was cancelled through September 12, 1983, when Smith obtained employment at the Wible Lumber Company, is $20,209.15.

### Conclusions of Law

■ The Fourteenth Amendment to the United States Constitution provides, in pertinent part:

No State shall ... deprive any person of life, liberty, or property, without due process of law[.]

U.S. Const. amend. XIV § 1. This case centers around the basic issue of whether the defendants violated plaintiff's Fourteenth Amendment rights, in particular his right to due process of law. In order to ascertain whether the Fourteenth Amendment has been violated in a particular case, a court must address and resolve two inquiries. First, whether there is a life, liberty, or property interest implicated which is protected by the Fourteenth Amendment; and, second, if so, what process is due. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). *Accord Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Morrissey v. Brewer,*

408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982).

The liability of the defendant, Donald R. Leitch, being sued in his official capacity as Sheriff of Noble County, Indiana is controlled by the test enunciated in *Monell v. Dept. of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The liability of Sheriff John W. Stoner, acting in his individual capacity, is controlled by the issue of Stoner's entitlement of a qualified immunity based on good faith. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The liability of the defendants will be addressed and determined, pursuant to these tests, after addressing the issues of the existence, if any, of a protected interest and the process due.

### I. EXISTENCE OF A PROTECTED INTEREST.

■ Only a limited range of interests fall within the protection of the Fourteenth Amendment. *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Liberty interests originate either in the Constitution or under state laws, policies, or practices. *Id.; Meachum v. Fano,* 427 U.S. 215, 223–27, 96 S.Ct. 2532, 2537–40, 49 L.Ed.2d 451 (1976); *Shango,* 681 F.2d at 1097. *See also Vitek v. Jones,* 445 U.S. 480, 487, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980). Plaintiff grounds his claim of entitlement to a substantive liberty interest upon state sources.

■ The Seventh Circuit recently stated: It is equally well established, however, that state statutes, practices, or duly promulgated prison regulations may create liberty interests deserving of the procedural protection of the Due Process Clause. If state statutes or prison regulations condition transfer on the occurrence of specific events, such as misconduct, a liberty interest is created.

*Harris v. McDonald,* 737 F.2d 662 at 664 (7th Cir.1984) (citations omitted). "[I]f a state gives prisoners (whose natural liberty has been suspended) a form of liberty, ...

the state may not deprive them of that liberty, any more than it may deprive a person of his natural liberty, without due process of law." *McKinney v. George*, 726 F.2d 1183, 1189 (7th Cir.1984). *See also Hewitt*, 459 U.S. at 470, 103 S.Ct. at 871; *Johnson v. Brelje*, 701 F.2d 1201, 1205–06 (7th Cir.1983).

■ A state may create a liberty interest by its statutes and by non-statutory sources. *Meachum*, 427 U.S. at 229, 96 S.Ct. at 2540; *Harris*, at 664; *Shango*, 681 F.2d at 1099; *Soto v. Cady*, 566 F.Supp. 773, 777 (E.D.Wisc.1983). However, "a state created procedural right is not itself a liberty interest within the meaning of the Fourteenth Amendment." *Shango*, 681 F.2d at 1101. "Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983) *citing with approval Shango*, 681 F.2d at 1100–1101. *See Olim*, 461 U.S. at 250 n. 12, 103 S.Ct. at 1748 n. 12 ("[A]n expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause."). *Accord Hewitt*, 459 U.S. at 470, 103 S.Ct. at 871; *Harris*, at 665.

■ Thus, the crucial focus in determining whether an individual has a legitimate claim of entitlement to a protected liberty interest is the nature of the interest at stake, not the source of the purported liberty interest. *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979); *Roth*, 408 U.S. at 571, 92 S.Ct. at 2705. *Accord Shango*, 681 F.2d at 1099; *Soto*, 566 F.Supp. at 778. Before a particular person can assert procedural due process rights, that person must demonstrate that he possesses a "parent substantive right" which underlies and supports the procedural rights. *Shango*, 681 F.2d at 1100–01; *Soto*, 566 F.Supp. at 777.

■ The test for determining whether an underlying parent right exists which be-gets "yet other rights to procedures essential to the realization of the parent right," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 463, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981), appears in *Olim*. "[A] state creates a protected liberty interest by placing substantive limitations on official discretion." *Olim*, 461 U.S. at 249, 103 S.Ct. at 1747. *See Dumschat*, 452 U.S. at 467, 101 S.Ct. at 2465 (Brennan, J., concurring). Several courts have begun applying the *Olim* test. *Lyon v. Farrier*, 727 F.2d 766 (8th Cir.1984); *Hayes v. Thompson*, 726 F.2d 1015 (4th Cir.1984); *Parenti v. Ponte*, 727 F.2d 21 (1st Cir. 1984); *Soto*, 566 F.Supp. at 777. *See also Mosrie v. Barry*, 718 F.2d 1151, 1161 n. 9 (D.C.Cir.1983) (noted with approval in a different factual context).

■ In this case, plaintiff asserts that a protected liberty interest exists in the terms and conditions of the sentence imposed upon him by the Noble County Circuit Court. Plaintiff argues that the sentence given to him created a protected liberty interest by placing substantive limitations on official discretion, here, the discretion of the Noble County Sheriff's Office and the person holding that office. The foregoing legal analysis supports plaintiff's proposition that the state could have created a protected liberty interest by placing substantive limitations on official discretion through its imposition of the work release sentence with its specific terms and conditions upon Smith.

*Shango* is direct support for the idea that the state created a constitutionally cognizable substantive liberty interest.

> In constitutional contemplation, ... the prisoner has no constitutionally cognizable entitlement to be located in a particular cell within a prison or at a certain location in the state—his freedom in that regard having been extinguished by his conviction—unless the state confers upon him such a substantive right. *It can confer such a right either explicitly, by providing in the convict's sentence a right to be incarcerated at a particular*

*institution,* or implicitly, by conditioning an inmate's transfer to another prison on the finding of certain specified behavior such as misconduct.

*Shango,* 681 F.2d at 1102 (emphasis supplied).

Smith's sentence gave him the right to be incarcerated at a particular institution, namely, the Noble County Jail. The judgment of conviction also gave Smith the right to be on work release status which allowed him to maintain his then current, private employment at Monsanto in Ligonier, Indiana. Smith's sentence also gave him the right to be released from the Noble County Jail to "attend any academic or vocational training programs or obtain medical, psychiatric or psychological treatment, including treatment for alcoholism." Plaintiff's Exhibit 2. The Noble County Circuit Court conditioned this specific sentence upon Smith being subject to "all rules and regulations of the Noble County Jail and the work release program." Plaintiff's Exhibit 2.

The rights given plaintiff in his sentence were far more than expectations. Smith had a legitimate claim of entitlement to the specific terms of incarceration provided for in his sentence with the only limitation being that Smith was to be subject to the rules and regulations of the Noble County Jail. The implicit right of Smith's sentence arose from the court's policy that a person incarcerated under a work release sentence who has abided by all the rules and regulations of the jail will be released no later than six (6) months after the commencement of his sentence.

It is obvious that the plaintiff, although lawfully incarcerated by the state, retained a greater "residuum of liberty" than the customary prisoner incarcerated in a confinement facility. *See Olim,* 461 U.S. at ——, 103 S.Ct. at 1745; *Hewitt,* 459 U.S. at 466, 103 S.Ct. at 869. The terms of plaintiff's incarceration were such that fewer of plaintiff's privileges and rights were withdrawn or limited by penal considerations or needs. *See Wolff,* 418 U.S. at 555, 94 S.Ct. at 2974; *Price v. Johnston,* 334 U.S. 266,

285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Smith's retained rights were "subject to restrictions imposed by the nature of the regime to which [he had] been lawfully committed." *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2975.

Smith enjoyed conditional liberty such as is enjoyed by those on probation or parole. *Cf. Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484; *Mempa v. Rhay,* 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). Plaintiff was not subject to all of the restraints that necessarily and normally inhere in a prison and during incarceration. *See Greenholtz,* 442 U.S. at 9, 99 S.Ct. at 2105.

This court, therefore, holds that the terms of the sentence imposed upon Smith gave Smith a liberty interest protected by the Fourteenth Amendment. This court must now determine what process is due the protected liberty interest Smith possesses.

## II. PROCESS DUE.

There can be little doubt but that the series of events which occurred in the summer of 1982 involving Smith and the defendants resulted in the deprivation of the conditional liberty which Smith possessed as a result of his sentence. "There is a crucial distinction between being deprived of the liberty one has, as in parole, and being denied a conditional liberty that one desires." *Greenholtz,* 442 U.S. at 9, 99 S.Ct. at 2105. Smith possessed a protected liberty interest which implicates the procedural due process rights inherent in the Fourteenth Amendment. In examining the process afforded Smith, this court must conclude that the process afforded does not satisfy the minimum requirements of the Due Process Clause with regard to the specific protected liberty interest this court concludes Smith possessed.

"The requirements imposed by the Clause are, of course, flexible and variable dependent upon the particular situa-

tion being examined." *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 872, *citing Morrissey,* 408 U.S. at 481, 92 S.Ct. at 2593. In considering what process is due in a particular situation a court should consider "the private interest at stake in a governmental decision, the governmental interest involved, and the value of procedural requirements." *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872, *citing Mathews v. Eldridge,* 424 U.S. at 335, 96 S.Ct. at 903. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews,* 424 U.S. at 333, 96 S.Ct. at 902, *quoting Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965).

▆▆▆▆ At the outset, this court wishes to make clear its conclusion that, based on the facts before this court, this case is not a typical prison discipline case. *Cf. Brown-Bey v. United States,* 720 F.2d 467 (7th Cir.1983); *Dawson v. Smith,* 719 F.2d 896 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1714, 80 L.Ed.2d 186 (1984); *Jackson v. Carlson,* 707 F.2d 943 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 189, 78 L.Ed.2d 167 (1983) *sub. nom. Yeager v. Wilkinson; McCollum v. Miller,* 695 F.2d 1044 (7th Cir.1982); *Lewis v. Faulkner,* 559 F.Supp. 1316 (N.D.Ind.1983). If it were a typical prison discipline case, this court's examination of what process is due would be quite different. Administration of confinement facilities falls peculiarly within the province of confinement facility authorities and not within the province of a court. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Among the matters peculiarly within the province of confinement authorities is the preservation and maintenance of internal order and discipline and institutional security; wide ranging deference should be given to confinement facility authorities. *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). *See also Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872. This court is "keenly aware that prison officials have broad discretion to structure and operate a prison disciplinary system. '[A]

court should [not] meddle in prison affairs unless legitimate constitutional issues are raised that require ... intervention.'" *Redding v. Fairman,* 717 F.2d 1105, 1112 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984), *quoting Bono v. Saxbe,* 620 F.2d 609, 621 (7th Cir.1980) (Wood, J., concurring in part). *See also Hewitt,* 459 U.S. at 466, 103 S.Ct. at 869; *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979; *Brown-Bey,* 720 F.2d at 469. But, as noted above, this is not a typical prison or jail disciplinary case.

▆▆▆▆ This is a case where an incarcerated person possessed and enjoyed, by virtue of his specific sentence, a conditional liberty akin to the conditional liberty possessed and enjoyed by persons on parole or probation. As one who was incarcerated, even though not under the same terms and conditions as the customary prisoner, at a minimum, Smith was entitled to the procedural due process rights set forth in *Wolff v. McDonald,* 418 U.S. at 563–572, 94 S.Ct. at 2978–2982. As one who enjoyed conditional liberty such as that enjoyed by probationers and parolees, Smith was entitled to the procedural due process rights accorded probationers and parolees at probation or parole revocation hearings. *Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756; *Morrissey,* 408 U.S. 471, 92 S.Ct. 2593. At a maximum, plaintiff may be entitled to the procedural due process rights accorded sentencing as a critical stage of a criminal proceeding. *Mempa,* 389 U.S. 128, 88 S.Ct. 254. *See also Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948).

▆▆▆▆ *Wolff v. McDonnell* and its progeny set forth the minimum due process requirements for prison disciplinary proceedings. *E.g., Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Those minimum due process rights are also codified at I.C. 35–50–6–4(c) and I.C. 35–50–6–5.5. The same minimum due process rights are detailed on the Notice of Jail Rule Violation used by the defendants.

*See also* Plaintiff's Exhibit 6 (D.O.C. Policy Handbook), Plaintiff's Exhibit 1 (Noble County handbook). In examining these rights, the court will focus only on those minimum due process rights which the court concludes were curtailed in plaintiff's case. Those minimum due process rights not properly accorded plaintiff were: (1) the right to have a reasonable time to prepare for the hearing; (2) the right to call witnesses and present evidence; (3) the right to confront and cross-examine each witness; (4) the right to have the assistance of a lay advocate; (5) the right to have a written statement of the findings of fact, the evidence relied upon, and the reasons for the action taken; and (6) the right to have a meaningful review of the hearing.

With regard to the due process right of having a reasonable time to prepare for the hearing, the court finds that the problem is not the amount of time that elapsed between the notification Smith received and the date of his hearing, but the opportunity Smith had to prepare in a meaningful way for the hearing. The *Wolff* court stated, "Part of the function of notice is to give the charged party a chance to marshal the facts in his defense and to clarify what the charges are, in fact." *Wolff,* 418 U.S. at 564, 94 S.Ct. at 2978. Smith had no real or meaningful opportunity to marshal the facts in his defense or to clarify what the charges were, in fact. All of the charges involved occurred long before the hearing process began. Under defendant's own rules the charges should not have been brought.

■ It was proper to segregate plaintiff from the other prisoners pending the resolution of the charges. *Hewitt,* 459 U.S. at 475, 103 S.Ct. at 873. However, it was improper not to present Smith with the witness statements. At no time in any of these proceedings has there been any hint that the question of safety to other inmates would have been involved if Smith had been given the witness statements prior to the hearing. In fact, Smith was given the witness statements after the hearing as defendants' attempt to comply with the written statement due process requirement. No reason whatsoever has ever been advanced as to why Smith was not given information he needed to attempt to prepare an effective defense. *Compare McCollum,* 695 F.2d at 1048–49 *with Jackson,* 707 F.2d at 948. Smith was entitled, as a matter of minimum due process, to more information than he was given prior to the hearing in order to allow Smith to marshal his defense.

■ Defendants improperly limited Smith's right to call witnesses and present evidence. There was nothing before Smith to indicate that he needed to fill out a specific form prior to the beginning of the hearing in order to have witnesses or to present evidence. Smith testified that he would have called some witnesses if he could have. Again, there was no discussion or hint at any time that Smith's right to call witnesses needed to be limited to minimize disruption of the jail or to avoid a serious safety problem. *See Wolff,* 418 U.S. at 566, 94 S.Ct. at 2980. The reasons for not allowing a witness to be called or limiting access to other inmates to collect statements or to compile documentary evidence should be clearly stated on the record in any prison disciplinary proceeding. *Id.*

■ A prisoner has no absolute right to cross-examine witnesses at a prison disciplinary proceeding. *Baxter,* 425 U.S. at 321–22, 96 S.Ct. 1559–60; *Wolff,* 418 U.S. at 567–69, 94 S.Ct. at 2980–81. However, considerations for limiting cross-examination appear to be where there is a potential for havoc and where the disciplinary procedure would become so long as to be unmanageable. *Wolff,* 418 U.S. at 567, 96 S.Ct. at 2980. Neither one of those considerations is present on these facts. Smith was allowed to conduct some cross-examination; there obviously was no potential for havoc in allowing the right of confrontation and cross-examination. Further, allowing Smith to cross-examine all witnesses on all of the incidents about which they testified would not have made the hearing that

much longer. The crucial witness in this case whose cross-examination by Smith was limited is Gary Nichols. Nichols testified, not only about the charges he personally brought, but also about the charges brought by Jimenez. Smith was not allowed to cross-examine Nichols on the Jimenez incident. The Nichols testimony apparently played a great part in the Conduct Adjustment Officer's decision to find Smith guilty of the Jimenez charge although Nichols admitted being asleep during the actual incident. Smith's foreclosure from cross-examining Nichols about the Jimenez incident certainly contributed to the finding of guilty. Nichols was under no substantial risk of harm. *See* I.C. 35–50–6–4(c)(6); Notice of Jail Rule Violation, *e.g.*, Plaintiff's Exhibit 7.

■ Smith was also improperly denied the minimum due process right of having the assistance of a lay advocate. Smith was apparently denied this right because he did not request a lay advocate on the proper form or within the proper time frame. Nowhere in any of the information Smith received was it noted that he needed to fill out a specific form or make a request within a specific time frame. A state may not generally prohibit lay advocates from advising or assisting other inmates. *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). *See also Lewis*, 559 F.Supp. at 1320. While reserving the question for later discussion of whether Smith was entitled to counsel at this hearing, the court concludes that, at a minimum, Smith should have had the assistance of a lay advocate if he so desired. Smith would have used a lay advocate if he could have.

■ The most serious violation of the minimum due process rights to which Smith was entitled in June of 1982 is the complete failure of the defendants to comply with the due process requirement of making a minimally sufficient written record. The minimum due process requirement in prison disciplinary proceedings of written statements which enunciate the basis for the decisions involved, enunciate the basis for the punishments or sanctions in-

volved, and specify the evidence underlying the substantive decisions is a requirement that "is not to be taken lightly." *Redding*, 717 F.2d at 1114.

■ The Due Process Clause requires that the jail or prison involved "state not merely how it acts, but also why it acts in a particular manner." *Id.* at 1115.

> The line between constitutional adequacy and inadequacy is a fine, but important one.

> \* \* \* \* \* \*

> Each aspect of the freedoms most of us take for granted becomes more precious as the totality of freedom is reduced. Forfeiting good conduct time credit is perhaps the most serious loss. Prisoners thus must be protected from arbitrary actions extinguishing their privileges. The surest protection is an impartial decision-maker. And the integrity of that decision-maker can be insured only if she or he enunciates the bases for her or his actions.

> \* \* \* \* \* \*

> Due process simply requires a statement of what evidence forms the basis for the ... finding. Such a statement is more than a boilerplate sentence to be applied in every case, but not so complex as to require a lawyer to draft it.

*Id.* at 1116, 1116, 1116 n. 5.

The line between constitutional adequacy and inadequacy with regard to the minimum due process requirement of a written statement may be a fine line, but defendants have crossed that line. Even if one makes the assumption that Smith had no special protected interests beyond that of a normal prisoner, Smith was entitled to receive a written statement which detailed findings of fact, evidence and reasons for the actions taken. That written statement should have been presented to Smith at the conclusion of his hearing; presenting a prisoner with a piece of paper purporting to be a written statement weeks later is insufficient as a matter of due process.

Written records are required by the Due Process Clause in prison disciplinary cases in order to attempt to protect the prisoner "against collateral consequences based on a misunderstanding of the nature of the original proceeding." *Wolff*, 418 U.S. at 565, 94 S.Ct. at 2979. Written statements are also meant "to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly." *Id.* Finally, a written record, presented at the conclusion of the hearings or soon thereafter, are intended to eliminate the severe disadvantage which results if the inmate is forced to propound his own cause or to defend himself from others without a written record. *Id.*

■ Defendants also violated Smith's due process right to a meaningful review of the Hearing Officer's decisions. While such a right may only be implicit in *Wolff*, the State of Indiana gives the specific right to inmates, I.C. 35-50-6-5.5. *See Riner v. Raines*, 409 N.E.2d 575, 579 (Ind.1980). If a state imparts a due process right, then it must give that right. A review cannot be merely pro forma, a review must be one of substance, reviewing all aspects of the prior proceedings. Stoner admitted that he made no substantive review of the Conduct Officer's decision. Stoner testified he was looking only at the timeliness of the steps of the procedure used. The record clearly demonstrates that none of these procedures were timely. Smith was expected, as a condition of his sentence, to follow the rules and regulations of the jail. It seems reasonable that the jailers should also have to follow these same rules and regulations. They did not. Had the rules been followed, these charges would never have been pursued. Even the scant record Stoner had before him when he made his review demonstrates that none of the charges were reported to the Officer in Charge within twenty-four hours of their occurrence, nor reported to the Hearing Officer within ten days of the incidents. It was a policy of the Noble County Jail not to process stale

complaints. All of the charges involved were stale complaints.

Smith was entitled to a review of the Hearing Officer's decision. Giving such a review, however, would have been extremely difficult for Stoner as there were no notes, no written statements, no record of the testimony, no oral report from the Hearing Officer as to the contents of the hearing, no listing of all the witnesses who testified at the hearing or the evidence elicited from those witnesses, and no information concerning the actual procedural proceedings such as plaintiff's actual opportunity to cross-examine witnesses or plaintiff's actual opportunity to call witnesses. There was no review whatsoever of the actions taken by the Conduct Adjustment Officer, either as to form or substance. "Though [a prisoner's] rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is in prison for crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Wolff*, 418 U.S. at 555, 94 S.Ct. at 2974.

Finally, there is no explanation, either from the Conduct Adjustment Officer, or from Stoner, as to the severity of sanctions imposed upon Smith for findings of guilt on Smith's first accusations of violations of the rules. This court can find no support for the proposition that a finding of a violation of a rule of the Noble County Jail, either major or minor, by a work release inmate, results in the automatic mandatory removal of that prisoner from work release. It is obvious that such a sanction is nothing more than a *de facto* resentencing of a work inmate prisoner at a hearing not generally considered to be a critical stage of a criminal proceeding. State law, the Noble County Jail Handbook and the Department of Correction Handbook all speak to the necessary task of insuring that the sanctions imposed in a particular case will take into account frequency and seriousness of the offense or offenses. I.C. 11-12-4-3; Plaintiff's Exhibits 1, 6. The sanction "imposed must be proportionate to the

seriousness of the violation." I.C. 11–12–4–3. Further, the Noble County Jail Handbook seems to indicate that no sanction should exceed thirty days. *See* Plaintiff's Exhibit 1 at p. 1, ¶ 6.

■ For his first guilty findings of violating two rules of the jail, Smith not only was removed from work release, but also had his credit class reduced and had all of his good time credit taken away retroactive to the start of his sentence. It appears that for his initial violations, Smith had the maximum allowable sanctions imposed under D.O.C. guidelines. *See* Plaintiff's Exhibit 6, Appendix 1. In fact, the sanction of removal from work release, which necessarily resulted in Smith's change in security facilities, appears to go beyond the maximum allowable sanctions given under the D.O.C. guidelines. The D.O.C. guidelines state that the sanction for the types of violations of which Smith was found guilty "may include a recommended change in security classification." Plaintiff's Exhibit 6, Appendix 1, ¶ 4. Plaintiff's removal from work release which resulted in his placement at a more secure facility was far more than a mere recommendation by Stoner.[7] The practical effect of the sanctions imposed which were reviewed by Stoner was the *de facto* resentencing of Harold Smith.

If this were the normal prison discipline case, the court would stop at this point in the analysis and assess damages. However, this is not a normal prison discipline case. This case involves a person whose "extent and nature of his freedom is qualitatively different from any 'freedom' allowed [in] prison. Moreover, revocation of that status [entailed] a loss far more grievous than that sustained by one who is transferred from one prison to another." *Durso v. Rowe*, 579 F.2d 1365, 1371 (7th Cir.1978). There remain two unanswered questions. One, whether plaintiff was entitled to the right to counsel such as is accorded parolees and probationers or two, whether plaintiff was entitled to the right to counsel such as is accorded criminal defendants at critical stages of criminal proceedings.

■ The protected liberty interests Smith held in June of 1982 were very close to the protected liberty interests held by those on probation or parole. *Scarpelli* requires that, in probation or parole revocation proceedings, where the probationer or parolee makes a request for counsel based on a timely and coloarable claim, minimum due process requires that counsel be appointed. *Scarpelli*, 411 U.S. at 790, 93 S.Ct. at 1764. This court concludes that the facts of this situation are sufficiently like those facts normally present in probation or parole revocation hearings to require that counsel be provided if a request is made under similar circumstances. Plaintiff requested an attorney. He was informed he could not have one. Plaintiff was allowed to consult in a very limited manner with an attorney. That attorney believed he was not able to be present and defend Smith at the hearing of June 22, 1982. That attorney believed he could have defended Smith successfully.

The then current counsel for plaintiff testified that he felt he could have materially aided Smith had he been allowed to be present. The defendants would not allow counsel to be present at the hearing. Because of the peculiar factual situation present in this case akin to the factual situations of parole and probation revocation and because plaintiff made a request for an attorney based on a timely and colorable claim, this court concludes that due process required that plaintiff have his attorney present as he requested. Plaintiff's right to counsel was abrogated in this case.

---

**7.** Plaintiff raises the issue of Sheriff Stoner's impartiality. This court concludes Stoner was impartial even if the review itself was woefully inadequate. "[T]he requirement of impartiality mandates the disqualification of an official who is directly involved in the incident or is otherwise substantially involved in the incident but does not require the disqualification of someone tangentially involved." *Merritt v. De Los Santos,* 721 F.2d 598 (7th Cir.1983). *See also Redding v. Fairman,* 717 F.2d 1105, 1112–13 (7th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1282, 79 L.Ed.2d 685 (1984). Stoner was only tangentially involved.

Further, I.C. 35–50–6–4(b) and I.C. 35–50–6–5(a) state that violation of a condition of probation or parole cannot be the basis for reassignment to a different credit time class or deprivation of credit time. Arguably, Smith's sentence was enough like probation or parole that, as a matter of law, he could not have the sanctions imposed upon him which were imposed, *i.e.*, de facto reassignment to a more secure facility, actual reassignment to a lower credit time class, actual deprivation of credit time earned, and de facto resentencing. *Scarpelli* applies to the facts of this case.

There is one final question to consider and that is the question of whether this factual situation is a proceeding which was, in actuality, a critical stage of Smith's criminal proceedings at which he would be automatically entitled, as a matter of due process, to the assistance of counsel. *See Mempa,* 389 U.S. 128, 88 S.Ct. 254. *Mempa* involved a situation where there was a deferred sentencing procedure coupled with probation provisions. The person involved had committed a crime and was placed on probation with actual sentencing being deferred pending the person's behavior on probation.

■ A deferred sentence held in abeyance because of compliance with required behavior standards is precisely the situation that exists here. Smith was on a type of probation, the length of which was to be six months. Smith and the defendants were aware that if Smith did not pass the six month period in a satisfactory manner, a stiffer and far more serious sentence would be imposed. The proceeding of June 22, 1982 which resulted in the revocation of plaintiff's favored status was a critical stage of a criminal proceeding at which plaintiff was entitled to effective assistance of counsel.

■ A critical stage of a criminal proceeding is defined as a stage "where substantial rights of a criminal accused may be affected." *Mempa,* 389 U.S. at 134, 88 S.Ct. at 257. There can be no doubt but that substantial rights of Harold Smith were affected by the proceedings of June

of 1982 at the Noble County Jail. This is so because "[t]he defendant has a legitimate interest in the character of the procedure which leads to the imposition of sentence even if he may have no right to object to a particular result of the sentencing process." *Gardner v. Florida,* 430 U.S. at 358, 97 S.Ct. at 1205.

At a deferred sentencing hearing counsel is necessary to aid "in marshaling the facts, introducing evidence of mitigating circumstances and in general aiding and assisting the defendant to present his case[.]" *Mempa,* 389 U.S. at 135, 88 S.Ct. at 257. Counsel is also important at this critical stage because "certain legal rights may be lost if not exercised at this stage." *Id.* Uncounseled persons, entitled to counsel at a critical stage of a proceeding, are simply unaware of the opportunities they might have to counter the evidence and witnesses being introduced at a particular proceeding. Plaintiff simply had "no opportunity to correct by the services which counsel would provide" the defects in the hearing of June 22, 1982. *Townsend v. Burke,* 334 U.S. at 741, 68 S.Ct. at 1255. Plaintiff was entitled to counsel.

## III. LIABILITY OF DEFENDANTS.

Having determined that Smith possessed a protected liberty interest under the Fourteenth Amendment and having determined that the process given was insufficient as a matter of law, the issue of responsibility and liability for the injury arises. Plaintiff brought suit initially against John W. Stoner in both his official and personal capacities. Later, when John Stoner no longer held the official office of Sheriff of Noble County, Indiana, the person holding that title was added as an additional party.

■ It is established that a claim against a person in his official capacity is but another form of claim against the governmental entity of which the person is an agent. *Monell v. Dept. of Social Services,* 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55 (1978); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 870 (7th Cir.1983); *Richardson v. City*

*of Indianapolis*, 658 F.2d 494, 501 (7th Cir.1981); *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981). Plaintiff sued John Stoner originally in his official capacity as Sheriff of Noble County, Indiana as well as individually. The person now holding the official capacity of Sheriff of Noble County, Indiana was later added to this lawsuit. Thus, plaintiff is suing the Office of Sheriff of Noble County, Indiana. ·

The suit before this court is controlled, in part then, by the test enunciated in *Monell. Monell* dictates:

> We ·conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694, 98 S.Ct. at 2037–38. Was the injury in this case caused by an official policy, custom or usage of the office of Sheriff of Noble County, Indiana which would render it liable?

■ Overwhelming evidence in the record supports the conclusion that the deprivation of liberty and due process rights suffered by Smith was caused by the customs, policies and usages of the Noble County Jail. The acts taken in this case were affirmative and were taken pursuant to customs used and followed by the Office of Sheriff of Noble County, Indiana in implementing known, important, codified rights. There is no denial in the record that all of what occurred in this case occurred pursuant to the customs practiced by the jail, that the defendants thought pro forma compliance was all that was necessary to carry out important safeguards. The manner in which the jail effectuated the state laws and D.O.C. rules set the official policy for the jail. All events here occurred in the name of official customs and usages. Under state law, all of the actions taken by the various employees of the Sheriff's Office were the actions of the Office. I.C. 36–2–16–3.

There also can be little doubt that the acts taken by Stoner as Sheriff of Noble County, Indiana were taken by one whose "acts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2038. Stoner had the final authority for decisions at the Noble County Jail. His acts were those of the official entity of the Sheriff of Noble County, Indiana. *Reed v. Village of Shorewood*, 704 F.2d 943, 953 (7th Cir.1983). Stoner directed his employees to do what they did in investigating and determining the guilt or innocence of Smith.

■ · A municipality cannot be held liable under section 1983 under a *respondeat superior* theory for the isolated torts of its employees. *Monell*, 436 U.S. at 691–92, 98 S.Ct. at 2036; *Powe v. City of Chicago*, 664 F.2d 639, 649 (7th Cir.1981).

> [A] municipality may be cast in damages only for its own acts or omissions, and a municipality "acts" by establishing or countenancing policies or practices which its employees are expected to follow in performing their duty.... [W]hen an official performs his duties according to established policies or practices, but in doing so violated another's rights, then it is. the municipal entity, which established or perpetrated the policies, that· should be held liable.

*Powe*, 664 F.2d at 649. While Stoner, individually, may be entitled to a qualified immunity based upon good faith, the Office of Sheriff of Noble County, Indiana does not possess and is not entitled to any qualified immunity based upon good faith. *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

The Office of Sheriff of Noble County, Indiana is liable for plaintiff's deprivation of Fourteenth Amendment rights. Plaintiff has established a direct affirmative link between his deprivation of Fourteenth Amendment rights· and customs, policies, and practices of the Office of Sheriff of Noble County, Indiana. Thé employees and agents of the Office of Sheriff of No-

ble County, Indiana, proceeded in this matter according to those customs, practices and policies. The employees involved in this case were performing their duties according to established policies and practices. The Sheriff's Office established and countenanced the pro forma, meaningless giving and application of important minimum due process rights. The custom and practice of pro forma application of these fundamental rights is in direct contravention of the Constitution, state law, D.O.C. rules, and Jail rules.

■■■ The suit, insofar as it relates to Stoner individually, is controlled by the issue of Stoner's entitlement to a qualified immunity based upon good faith. *Harlow v. Fitzgerald* sets out the test:

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

457 U.S. at 818, 102 S.Ct. at 2738. The test is an objective one. Qualified good faith immunity is available to law enforcement officials acting in their official capacities. *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). *See also Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Lenard v. Argento*, 699 F.2d 874 (7th Cir.1983); *Brubaker v. King*, 505 F.2d 534 (7th Cir.1974). Plaintiff claimed and proved violations of his Fourteenth Amendment rights. While *Harlow* does not address specifically whether the objective test applies to state officials being sued under section 1983, it sets out a very broad hint that it would make no distinction between suits against state officials and suits against federal officials in applying the objective tests for determining good faith. *Harlow*, 457 U.S. at 818 n. 30, 102 S.Ct. at 2738 n. 30. *See also Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). The Seventh Circuit applies the *Harlow* test to suits involving state officials being sued for damages under section 1983. *Johnson*, 701 F.2d at

1201 (7th Cir.1983); *Crowder v. Lash*, 687 F.2d 996 (7th Cir.1982).

■■■ This court, applying the *Harlow* test to the facts of this case, concludes that Stoner's actions were not taken in good faith. In June of 1982, when Stoner took his actions, *Wolff v. McDonald* was eight years old. Additionally, the specific minimum due process rights due any prisoner were codified in state law and set forth in Indiana Department of Correction policies and, in part, set forth in the Noble County Jail handbook. It could not have been any clearer to Stoner what the precise minimum due process rights were that Smith had to be accorded. The law was clear and is clear that any prisoner, in a prison disciplinary proceeding, has the right to prepare meaningfully for the proceeding, to call witnesses and present evidence, to confront and cross-examine witnesses unless there is a safety reason involved, to have the assistance of a lay advocate, to have a detailed written statement presented to him immediately or soon after a particular proceeding is held, and to have a meaningful and substantive review of the actions taken at the prison disciplinary proceeding. Stoner knew of the constitutional requirements and of the specific statutory requirements and of the specific rules and regulations. Stoner gave a pro forma application of these rights to Smith and did not stop others in his charge from giving pro forma applications of fundamental rights. Paying lip service to crucial constitutional rights is not enough. Important constitutional rights were abridged or denied in this case. Stoner must bear personal responsibility. His actions were not taken in good faith. Stoner acted recklessly and with callous indifference. Stoner's conduct and actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.

## IV. DAMAGES AND ATTORNEYS FEES.

Plaintiff has proven by a preponderance of the evidence that his Fourteenth Amendment rights were violated and that the

Office of Sheriff of Noble County, Indiana and Stoner are liable for those deprivations. Plaintiff is entitled to recover damages. Plaintiff has made a claim for damages which includes past and future wages.

 ■ In order to recover anything more than nominal damages in a section 1983 action for injuries caused by deprivation of constitutional rights, actual injury must be shown; actual injury cannot be presumed from a deprivation of constitutional rights. *Carey v. Piphus*, 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978); *Saxner v. Benson*, 727 F.2d 669, 672 (7th Cir.1984); *Kincaid v. Rusk*, 670 F.2d 737, 745–46 (7th Cir.1982). *Accord Crawford v. Garnier*, 719 F.2d 1317 (7th Cir.1983); *Freeman v. Franzen*, 695 F.2d 485 (7th Cir.1982). The Seventh Circuit has enumerated some of the elements of compensable injury: "Emotional distress, humiliation personal indignity and physical injury." *Crawford*, 719 F.2d at 1324. Other factors include mental distress and embarassment. *Freeman*, 695 F.2d at 493. In the absence of a showing of some of these elements of compensable injury, a plaintiff who has shown a deprivation of constitutional rights will be entitled to an award only of nominal damages in addition to any special damages the plaintiff may have. "Damages should not go beyond adherence and become a windfall." *Lenard*, 699 F.2d at 890.[8]

 ■ Actual losses suffered by a plaintiff who has proven a violation of his constitutional rights are compensable. *E.g., Crawford*, 719 F.2d at 1324. This court concludes that plaintiff suffered actual losses because of the violation of his Fourteenth Amendment rights. However, plaintiff is not entitled to recover for actual losses after the August 1982 application period closed at Monsanto on September 1, 1982. Smith never attempted to obtain reemployment at the Monsanto Corporation

following his release from prison in March of 1983. It is speculation to make any conclusions about Smith's actual rehire prospects at the Monsanto Corporation if he had made application. The evidence on the question of rehire is simply too inconclusive for this court to conclude that plaintiff has proven he is entitled to damages for future losses of wages.

 ■ Smith, however, has proven, by a preponderance of the evidence, that he suffered losses of actual wages from the time of his removal from work release until he failed to make application at Monsanto by September 1, 1983. The amounts involved, computed up to September 12, 1983, have been stipulated into the evidence by the parties. The court does not have enough specific information to compute the wages and fringe benefits to September 1, 1983. The parties can stipulate to the proper amount as it is simply a matter of taking twelve days off the $20,209.15 figure already stipulated into the evidence. Plaintiff is entitled to recover the amount of lost wages and fringe benefits from June of 1982 through September 1, 1983. Plaintiff is estopped from claiming any further lost wages or fringe benefits because of his failure to make reapplication to the Monsanto Corporation. Turning to the question of whether plaintiff has shown by a preponderance of the evidence an entitlement to compensable injuries for the emotional distress, humiliation, trauma and embarassment he suffered because of these events, the court concludes that the plaintiff has not proven his entitlement to compensation for emotional injuries to the satisfaction of the court. The plaintiff has not carried his burden of proving these damages by a preponderance of the evidence. *See Carey*, 435 U.S. at 264 n. 20, 98 S.Ct. at 1052 n. 20.

---

8. Plaintiff asserted a claim of $50,000 for damage to his reputation due to the public dissemination of the homosexual misconduct charge. The court concludes that the scant evidence in the record is insufficient to prove by a preponderance of the evidence that the defendants

were responsible for the alleged injury. Plaintiff brought out much of the specifics of the charge on his own. A violation of I.C. 34–1–62–1 has not been proven. Plaintiff cannot recover on this claim.

The compensatory damage award shall bear prejudgment interest from the date it fully accrued (September 1, 1983) until the date of entry of this judgment. The rate of interest for both prejudgment and post-judgment interest shall be calculated and computed in accordance with the provisions of 28 U.S.C. § 1961 as presently enacted. *See Merit Insurance Co. v. Leatherby Insurance Co.,* 728 F.2d 943, 944 (7th Cir. 1984); *Merit Insurance Co. v. Leatherby Insurance Co.,* 714 F.2d 673, 683 (7th Cir. 1983) (cases implicitly approving award by district courts of prejudgment interest). *See also Argonaut Insurance Co. v. Town of Cloverdale, Indiana,* 699 F.2d 417, 421 (7th Cir.1983); *Bricklayers' Pension Trust Fund v. Taiariol,* 671 F.2d 988 (6th Cir. 1982); *United States v. California State Board of Equalization,* 650 F.2d 1127 (9th Cir.1981), *aff'd mem.* 456 U.S. 901, 102 S.Ct. 2261, 72 L.Ed.2d 157 (1982). *See generally Rodgers v. United States,* 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3 (1947).

Plaintiff also requests the court to award punitive damages. The United States Supreme Court held in *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), that governmental units are not subject to punitive damages in section 1983 suits. The Office of Sheriff of Noble County, Indiana, cannot be held liable for punitive damages. However, because this court found Stoner liable personally, this court must consider whether an award of punitive damages against Stoner is supported by the record.

Punitive damages may be assessed "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The Seventh Circuit requires a showing of aggravating circumstances or malicious intent to justify an award of punitive damages. *See, e.g., Merritt,* 721 F.2d at 601; *Freeman,* 695 F.2d at 490. Thus, the Seventh Circuit requires "something more than mere negligence before punitive damages can be assessed, but [this requirement] may not be applied to restrict the availability of punitive damages in ways inconsistent with *Smith v. Wade.*" *McKinley v. Trattles,* 732 F.2d 1320, 1327 (7th Cir.1984).

Punitive damages are awarded for the purpose of deterring or punishing constitutional violations. *Merritt,* 721 F.2d at 601. *See also Smith,* 461 U.S. at 48, 103 S.Ct. at 1636; *Lenard,* 699 F.2d at 890. This was a bench trial. It is within the discretion of this court to award punitive damages. *Merritt,* 721 F.2d at 601; *Busche v. Burkee,* 649 F.2d 509 (7th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). This court is not required to award punitive damages. Further, an award of punitive damages must be supported by the record. *Merritt,* 721 F.2d at 601.

*Merritt* is directly on point. The Seventh Circuit found the award of punitive damages was not clearly erroneous. *Merritt* involved a prison discipline hearing where the inmate's right to an impartial tribunal was clearly violated (an officer who had been substantially involved in the incident sat on the Adjustment Committee over inmate's protest). The lower court found the defendant's conduct willful and knowing. The Seventh Circuit noted,

> [T]his case involves a clear violation of the Administrative Regulation and of the plaintiff's constitutional rights. Defendant's attempts to argue otherwise are disingenuous at best.

*Id.* at 602. The *Merritt* court held the punitive damage award had a "readily apparent deterrent effect on this type of willful violation of a plaintiff's due process rights." *Id.*

Disingenuous is the appropriate characterization of Stoner's arguments here. Stoner's position throughout has been not only that there have been no violations of plaintiff's rights, but also that this is a frivolous, vexatious lawsuit designed to harass the defendants and that they are entitled to fees. Stoner's position could not be

further from the truth and the facts of this case. Every person, no matter where located or what he has done, is protected by and accorded the protections of the Constitution.

■ This court will award punitive damages in the amount of $2,000.00. Aggravating circumstances are present. This record involved a clear violation of, not only plaintiff's constitutional rights, but also plaintiff's rights given him by administrative regulations and rules. Stoner knew what the rules were, even if he were to argue that he was unaware of what plaintiff's maximum constitutional rights were. This court concludes that Stoner acted in reckless and callous disregard of Smith's rights. Smith did not receive the rights of: preparing meaningfully for the disciplinary proceeding, calling witnesses and presenting evidence, confronting and cross-examining witnesses, having the assistance of a lay advocate, having a detailed written statement presented immediately or as soon as practicable after the hearing was over, and having a meaningful review of the actions taken at the hearing.

While this court concludes that Stoner did not act from an evil motive or intentionally, Stoner's conduct was egregious in that Stoner knew the laws, the rules and the rights, yet he recklessly and callously refused to apply those rights in a substantive, meaningful manner. Stoner's conduct should be punished and like conduct deterred. Obviously, the presence of the rights codified in state law and printed in regulations was not sufficient to cause Stoner to conform his conduct to constitutional standards. *McKinley,* 732 F.2d at 1327. *See Smith,* 461 U.S. at 53, 103 S.Ct. at 1638; *Merritt,* 721 F.2d at 602. This award of punitive damages is necessary because confinement officials must follow the law and their own rules and regulations and because putting those rights in writing and informing the officials of those rights is, apparently, not sufficient

to cause them to conform their behavior to law in certain situations. Setting forth Stoner's obligations in writing clearly was insufficient to deter Stoner from violating Smith's rights.

Plaintiff seeks an award of attorney fees if successful. Section 1988 of Title 42 of the United States Code so provides.[9] The court finds that costs and attorneys fees should be assessed against the defendants in this action. The considerations relevant to computing a reasonable attorney fee award have been set forth by the United States Supreme Court in *Blum v. Stenson,* —— U.S. ——, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

■ While plaintiff's request for an award of attorneys fees will be granted, the court cannot at this time, on the showing before it, compute the proper amount of such an award. Plaintiff will therefore be directed to file, not later than twenty (20) days from the date of this judgment, a complete breakdown and explanation of charges and time and such other materials supporting the request for attorney's fees as required by *Blum* and *Hensley.* The amount of such an award will be set by further order of the court. A copy of plaintiff's showing relating to attorneys fees shall be served on defendants, and defendants shall have ten (10) days from the date of filing to respond or otherwise challenge the showings and fees set forth.

### Conclusion

Plaintiff has established by a preponderance of the evidence that defendants violated plaintiff's Fourteenth Amendment rights. Accordingly, a violation of section 1983 has been shown, thus entitling plaintiff to damages of lost wages and benefits from June 29, 1982 to September 1, 1983, with prejudgment interest calculated and computed at the same rate as set forth for

---

**9.** Section 1988 provides, in pertinent part:

In any action or proceeding to enforce a provision of sections ... 1983, ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

post-judgment interest in 28 U.S.C. § 1961, dating from September 1, 1983 through the date of entry of this judgment. The parties shall stipulate the appropriate amount. Plaintiff is also entitled to an award of punitive damages from defendant Stoner in the amount of $2,000.00. Plaintiff shall also be entitled to costs and attorney fees to be awarded by further order of this court. This Memorandum of Decision contains the court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. *See Rucker v. Higher Educational Aids Board,* 669 F.2d 1179, 1183–84 (7th Cir. 1982).

On Motion to Amend or Alter Judgment

This matter is before the court on defendants' Rule 59(e) "Motion to Alter or Amend Judgment," filed September 17, 1984. For the following reasons, defendants' motion will be denied.

 The substance of defendants' post judgment motion is that of a Rule 59(e) motion. *See Sunstream Jet Express, Inc. v. International Air Service Co.,* 734 F.2d 1258 (7th Cir.1984); *Bank of California v. Arthur Andersen & Co.,* 709 F.2d 1174 (7th Cir.1983). Defendants asked this court to "reconsider its judgment and correct rules of law." *United States Labor Party v. Oremus,* 619 F.2d 683, 687 (7th Cir.1980), *quoted in A.D. Weiss Lithograph Co. v. Illinois Adhesive Products Co.,* 705 F.2d 249, 250 (7th Cir.1983). "Rule 59(e) provides a mechanism by which a trial judge may alter, amend, or vacate a judgment." *Clipper Exxpress [sic] v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1249 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983). A trial court is within its power to modify the findings, conclusions or judgment in ruling on a Rule 59(e) motion, in order to clarify the rationale for its decision. *See McCraw v. Simpson,* 141 F.2d 789 (10th Cir.1944). *See also Bank of California v. Arthur Andersen & Co.,* 709 F.2d at 1176.

Defendants raise twelve issues in their motion, the majority of which have all been raised previously. Several issues raised in defendants' motion contradict previous positions the defendants have taken and are raised here for the first time. Defendants now contend Smith "did not raise any issue of procedural violations when he requested a review," apparently arguing that Smith had some obligation to detail the type of review he wanted. Defendants also now argue that Smith waived his right to written findings of fact by not requesting findings of fact when he requested a review. Finally, defendants raise the argument that the evidence supported the decision of the conduct adjustment officer and the result would have been the same regardless of whether Smith had received his minimum due process rights.

 Issues which could have been presented to the court for consideration previously, but which were not, are not the proper subject of Rule 59(e) relief; the issues are waived. *Echevarria v. United States Steel Corp.,* 392 F.2d 885, 892 (7th Cir.1968); *Briggs & Stratton Corp. v. Baldridge,* 544 F.Supp. 667, 668 (E.D.Wis. 1982). However, in order to make this court's position clear, the court will address these new contentions as the contentions are meritless.

 Smith was under no obligation to detail specifically the type of review he desired. Smith testified and the court fully credits his testimony that when asked if he wanted to appeal he replied that he did; he was given two forms and told to sign and date the forms. He asked the conduct adjustment officer, referring to one of the forms, if that was where he was supposed to write; the officer told him that he was to do nothing but sign and date the forms and return them. Smith complied with the officer's instructions. A review of the appeal forms in evidence reveals that there is no space on the form to detail the specific type of review one wishes; there are single lines to fill out name, prisoner number, date of hearing, charge, date of offense, plea, decision and request. The request is

a yes or no choice with no space for indicating the type of review desired.

It is logically and legally indefensible to assert that a person requesting a review of a disciplinary proceeding would not be asking for a review which included a review of the specific rights the jail had informed him he had. Stoner testified and this court found that Stoner made a review only of procedure, the very thing defendants now argue Smith did not request. Defendants' position on this matter is inconsistent.

■ Defendants also now argue that Smith waived his right to written findings of fact by not requesting them in his written request for review. This court found that Smith immediately asked for written findings upon being informed of the guilty decisions; he was told that the unrelated witness statements were his findings. Defendants' position throughout has been that what was given Smith were findings of fact. Again, a review of the appeal form reveals that there is no space to indicate any objections and certainly no space to indicate a prisoner desires findings of fact. Smith was entitled to written findings as a matter of minimum due process; he did not need to state that entitlement in writing.

■ Defendants now argue the substance of the decision, claiming the decision would have been the same regardless. The substance of the decision is not before the court nor is it relevant. It is impossible to know if the outcome would have been the same—there is no record to review. Further, it is not the role of this court to review prison disciplinary proceedings on the merits. It is the role of this court, however, to determine whether a prisoner received his minimum due process rights. This court will accord deference to prison officials, but the question of whether minimal due process safeguards were observed is a question of federal law and is a proper question for this court to address and resolve. That question is precisely what this court addressed and resolved; the court will not address the question of sufficient evidence.

Defendants raise the issue of Smith's prehearing segregation from work release, arguing that Smith could be segregated without a hearing. Defendants apparently believe that the court found in plaintiff's favor on this issue. Defendants should read this court's opinion. This court clearly and unmistakeably held on page 30 of its opinion that it was proper to segregate Smith, i.e., remove him from work release, pending his disciplinary hearing. The court held for defendants on this issue.

In examining defendants' motion, it became clear to this court that defendants misapprehended a crucial part of this court's conclusion. Defendants apparently believe that this court has held that the Fourteenth Amendment to the Constitution imparts the constitutional right to an administrative appeal. That is not the court's holding.

This court found that Smith had a protected liberty interest in the terms of his work release sentence (not in the expectation he would be released). That sentence put him in the custody of the Sheriff of Noble County on the Work Release Program, subject to the rules and regulations of the jail. Smith would also be subject to applicable state law. Smith was not committed to the Sheriff's discretion. It is patently absurd to assert that Smith had to follow the rules and regulations, but, apparently, the Sheriff and his agents were not subject to any of the rules and regulations. Smith's sentence gave him the liberty interest to remain incarcerated in the Noble County Jail on the Work Release Program, subject to the strictures and the benefits of the rules and regulations of that jail.

■ Those rules and regulations provided that certain procedural safeguards applied, including the right to a review. Defendants argue that it was not required that Smith be given a review because there were no substantive limitations placed on the Sheriff's discretion. Defendants are wrong. It is true that the review provided for in the jail handbook does not go into

**1120**

detail as to what is to be reviewed; it did not need to go into detail. The detail is obvious: the notices provide for specific rights to be accorded to prisoners—that is what is supposed to be reviewed, along with the substance of the evidence. There were substantive limitations on the Sheriff's discretion. Smith's sentence gave him the right to be accorded the rights given him by the jail rules, regulations and notices.

■ Further, there were substantive limitations placed on the Sheriff by state statute. The State of Indiana codified a prisoner's right to procedural due process safeguards during his disciplinary hearing and codified the burden of proof which must be met to find a prisoner guilty (preponderance of the evidence). These safeguards attach to determinations of credit time reclassifications and credit time deprivations. I.C. 35-50-6-4; I.C. 35-50-6-5. The State of Indiana could have stopped at this point in its limiting of correctional facilities authorities' discretion. But the State went further: the State of Indiana codified the right of a prisoner to a review of the decision. I.C. 35-50-6-5.5. I.C. 35-50-6-5.5 specifically provides:

A *person* who has been reassigned to a lower credit time class or has been deprived of earned credit time *is entitled to a review of the decision by ... the sheriff.*

(Emphasis supplied.) The State of Indiana has placed substantive restrictions on a sheriff's discretion. The sheriff has no discretion—the sheriff must review the decision.

■ The defendants in this suit cannot seriously dispute that there was no review. There was, essentially, nothing before Stoner that he could review, either as to form or substance. If a state, either through a specific sentence or through a specific statute, gives an entitlement to a prisoner, that prisoner is entitled to receive from the authorities the rights or safeguards the state gave him. Reading the statutes *in pari materia*, it is obvious that a review of the decision made by a sheriff must include a review of what the statutes mandate must be given to a prisoner in a disciplinary proceeding: whether the procedural safeguards were given and followed and whether the decision was supported by a preponderance of the evidence. Defendants wholly ignored specific statutory mandates of the State of Indiana.

■ This court's decision is based upon the premise, established by case law, that a state can create substantive liberty interests and where it is asserted that a state has given an entitlement to a substantive liberty interest, a court looks to state statutes, rules, regulations, sentences, etc. to determine if an entitlement has been created by the state. This court concluded that, based on the record, the state created an entitlement to certain liberty interests in Smith's specific situation. Once it is determined that someone holds an entitlement to an interest protected by the Fourteenth Amendment, it is a matter of federal law to determine what process is due. *See* analysis and cases cited in court's opinion. This court concluded that there were minimum due process safeguards that attached in this case, as a matter of federal law. A review of this record and this court's opinion makes clear that Smith had a substantive liberty interest in being incarcerated in the Noble County Jail on the Work Release Program subject to the rules and regulations of the jail which followed codified state law. Smith was entitled to the protections of those rules and statutes. Smith was not accorded the protections to which he was entitled. Prisoners lose a number of rights when they enter prisons, but they do not lose the right of being accorded certain minimum due process rights guaranteed by the United States Constitution when a state has given them a protected interest.

Accordingly, on the basis of the foregoing, defendants' Rule 59(e) motion is hereby DENIED.